Louis F. PEICK, et al.,
Plaintiffs-Appellants,

v.

PENSION BENEFIT GUARANTY COR-
PORATION, Defendant-Appellee.

No. 82–2081.

United States Court of Appeals,
Seventh Circuit.

Argued April 13, 1983.

Decided Dec. 19, 1983.

Sherman Carmell, Peter M. Sfikas, Chicago, Ill., for plaintiffs-appellants.

Baruch A. Fellner, Pension Benefit Guaranty Corp., Washington, D.C., for defendant-appellee.

Before CUDAHY and ESCHBACH, Circuit Judges, and SWYGERT, Senior Circuit Judge.

CUDAHY, Circuit Judge.

In this appeal, involving a suit seeking a declaratory judgment, we are asked to consider the constitutionality of the Multiemployer Pension Plan Amendments Act of 1980 (the "MPPAA"). Specifically, we are called upon to decide issues concerning the justiciability of this case and whether the district court erred in upholding the withdrawal liability provisions of the MPPAA against challenges based on the due process clause, the takings clause, and several other constitutional provisions. The district court granted defendant Pension Benefit Guaranty Corporation's (the "PBGC") cross motion for summary judgment and dismissed the case, thereby sustaining the constitutionality of the MPPAA. For the reasons detailed below, we affirm the district court in all respects.

I

*A. The Background of the MPPAA* [1]

The 1974 enactment of the Employee Retirement Income Security Act ("ERISA") marks the initial attempt by the federal government to regulate pension plans in a comprehensive manner.[2] This statute contains numerous provisions:

> Title I attacks the lack of adequate "vesting" provisions in many plans. Before ERISA, for example, if a plan did not provide for vesting until retirement, an employee with 30 years of service could lose all rights in his pension benefits in the event that his employment was terminated prior to retirement. Title I establishes minimum vesting standards to ensure that after a certain length of service an employee's benefit rights would not be conditioned upon remaining in the service of his employer. Employers were required to amend the terms of their plans to reflect these minimum standards effective January 1, 1976. [29 U.S.C.] § 1053(a) [ (1976) ]. A second area of difficulty was the inadequacy of the funding cycle used by many plans. To improve the fiscal soundness of these pension funds, Title II amends the Internal Revenue Code to require minimum funding. Title III imposes fiduciary responsibilities on the trustees of the pension funds and provides for greater information and disclosure to employee-participants. The final area of concern addressed by ERISA was the loss of employee benefits which resulted from plan terminations. In order to protect an employee's interest in his accrued benefit rights when a plan failed or terminated with insufficient funds, Title IV establishes a system of termination insurance, effective September 2, 1974.

*Nachman Corp. v. Pension Benefit Guaranty Corp.*, 592 F.2d 947, 951 (7th Cir.1979), *aff'd*, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980). The most relevant provision of ERISA for present purposes is the termination insurance program contained in Title IV. This program is run by the PBGC, a governmental entity which receives no direct federal appropriations. The PBGC relies instead primarily on premium payments: Under pre-MPPAA ERISA, multiemployer plans paid $.50 per covered employee per year while single employer plans—those created, operated and maintained by a single employer acting alone—paid $1.00 per covered employee per year to fund the PBGC. 29 U.S.C. § 1306 (1976).

Upon enactment of ERISA in 1974, the PBGC immediately insured the receipt of all "nonforfeitable benefits" that had been earned by employees in single employer

---

**1.** This section is essentially adopted from Judge Getzendanner's well-reasoned and thorough opinion below. *Peick v. Pension Benefit Guaranty Corp.*, 539 F.Supp. 1025, 1029–34 (N.D.Ill. 1982).

**2.** This is not to say that federal regulation was nonexistent prior to ERISA. *See* pp. 1271–1272 *infra*.

plans.[3] A single employer that wished to terminate its plan was thus first required to notify the PBGC. 29 U.S.C. § 1341(a). If an investigation subsequently revealed that the plan lacked sufficient assets to pay its "nonforfeitable benefits," the PBGC itself became obligated for the shortfall. *Id.* at § 1341(b), (c). Any amounts so expended could be recovered from the terminating employer, *id.* at § 1362, but the latter's liability could in no event exceed thirty percent of its net worth. *Id.* at § 1362(b)(2).[4]

Multiemployer plan benefits were treated differently. They were not insured unconditionally upon enactment, but rather were guaranteed solely at the discretion of the PBGC until January 1, 1978. At that time, the guarantees were to become mandatory. *Id.* at § 1381(c)(1). In the interim, the PBGC was authorized to determine on a case-by-case basis whether it would pay a terminating plan's beneficiaries the difference between the value of their guaranteed benefits and the value of the plan's assets on the date of termination. *Id.* at § 1381(c)(2). As in the single employer context, secondary employer liability was imposed in all cases in which PBGC funds were actually expended. Specifically, all employers that contributed to a terminated multiemployer plan during the five years immediately preceding termination were collectively liable to the PBGC for the amount the latter had disbursed, each employer for its proportionate share of the total. As in the case of single employer plans, no individual employer's termination liability could exceed thirty per cent of its net worth. *Id.* at § 1364. Employers that withdrew from an on-going (*i.e.,* non-terminating) multiemployer plan thus incurred a contingent liability. It was contingent first upon the plan's terminating within the next five years, and second, in the absence of mandatory benefit insurance, upon the PBGC's deciding to insure the plan's bene-

fits. ERISA did not, in general, obligate a withdrawing employer to provide the PBGC with any security for this potential obligation. An exception was recognized, however, in the case of a "substantial" employer, one that had contributed at least ten per cent of all contributions received by the plan over a specified period of time. *Id.* at § 1301(a)(2). Withdrawing employers meeting this description were required to place in escrow an amount equaling what their termination liability would have been had the plan terminated on the date of withdrawal. *Id.* at § 1363(b). Alternatively the employer could furnish a bond. *Id.* at § 1363(c)(1). If no termination actually occurred during the next five years, the escrow was refunded or the bond cancelled. *Id.* at § 1363(c)(2).

There were several reasons why Congress chose not to insure all multiemployer plan benefits immediately in 1974. Congress viewed multiemployer plans as more stable and secure than single employer plans and thus saw less need to insure the former. *See Connolly v. Pension Benefit Guaranty Corp.,* 581 F.2d 729, 734 (9th Cir.1978); 126 CONG.REC. 12,179 (1980) (remarks of Rep. Biaggi). Congress, moreover, was concerned about the potential costs of such a program. These worries became more prevalent as January 1, 1978 approached. Senator Javits warned his colleagues in late 1977 that he knew of several multiemployer plans which planned to terminate soon after the first of the year. *See id.* at S10099 (daily ed. July 29, 1980). Recognizing that it needed more time to study the entire problem, Congress delayed the effective date of the mandatory guarantee program and extended the PBGC's discretionary authority through June 30, 1979. Pub.L. No. 95–214, 91 Stat. 1501 (1977). At the same time Congress ordered the PBGC to prepare a comprehensive report analyzing the multiemployer situation.

---

**3.** Actually, these guarantees were made effective as of June 30, 1974, a date prior to ERISA's enactment. 29 U.S.C. § 1381(b) (1976).

**4.** Employers were in no event liable to the PBGC on account of terminations occurring prior to the date of ERISA's enactment. 29 U.S.C. § 1381(b) (1976).

The PBGC submitted its report on July 1, 1978. The major factual findings of the report were that:

1. There were about two thousand covered multiemployer pension plans with approximately eight million participants. Pension Benefit Guaranty Corporation, Multiemployer Study Required by P.L. 95–214, at 1, 20 (1978) (hereafter cited as PBGC Report).

2. About ten per cent of these plans were experiencing financial difficulties that could result in plan terminations before 1988. These plans had about 1.3 million participants. *Id.* at 1, 138.

3. If all of these troubled plans were to terminate, it could cost the insurance system about $4.8 billion to fund all plan benefits then covered by Title IV's guarantee. The annual premium needed to fund this liability would be unacceptably high. *Id.* at 2, 16, 139.

4. Limiting consideration to only those covered multiemployer pension plans which were experiencing sufficiently serious financial difficulties that it was likely they would become insolvent before 1988, the cost to the insurance system to fund all guaranteed plan benefits could be approximately $560 million. The annual per capita premium needed to fund this liability could rise from fifty cents to as much as nine dollars. *Id.* at 2, 16, 140.

The PBGC derived these figures by using a computer model that analyzed and predicted the projected financial health of a selected sample of plans. The PBGC stressed that it relied solely on economic data and statistical analysis in forecasting the expected number of terminations. It did not attempt to factor in as well any incentives favoring termination which ERISA itself might provide. *Id.* at 137, Appendix XIV. Nevertheless the PBGC argued that such incentives were both present and troubling:

Under the current statutory provisions, mandatory termination insurance for multiemployer plans would protect virtually all vested benefits in multiemployer plans, since the maximum guaranteeable benefit of $1,000 per month at age 65 is well above the average vested benefit level in multiemployer plans. . . .

Since all, or nearly all, of the vested benefits of participants would be guaranteed upon termination under the current law, the cost of plan termination to participants would be greatly reduced. This does not necessarily mean that participants will have an incentive to bargain for plan termination merely to take advantage of the insurance program. However, the removal of the threat of benefit losses does make termination a viable option to active employees in situations in which a high proportion of pension contributions is being used for the benefits of retirees.

The principal deterrent to plan termination under the current program is employer liability, which imposes a direct cost upon employers for termination, and an indirect cost on active employees since less money will be available for other labor costs. However, to assure that termination liabilities do not cause undue business hardship and loss of jobs, employer liability is limited to 30 percent of net worth. Because of this net worth limitation, employer liability may very well be less than the cost of maintaining the plan in some situations. Since the insurance program would cover most, if not all, of participants' vested benefits, it may be to the mutual advantage of the employers, the union, and the active employees to terminate the plan.

Other ERISA rules also may weaken a plan and result in eventual termination. The withdrawal rules may discourage large employers from entering multiemployer plans. The restrictions on benefit reductions contained in ERISA may cause a financially troubled plan to terminate, even though the benefits that would be paid if the plan terminated would be less (because of the guarantee limitations) than the benefits that would be paid if the plan were permitted to reduce its obligations to avoid termination. *Id.* at 23–24 (footnote omitted).

The PBGC analyzed in addition a number of ways ERISA could be amended. It examined proposals that would:

1. Require the PBGC to pay guaranteed benefits only when a multiemployer plan became insolvent, rather than simply terminated. *Id.* at 56, 57, 69, 70.

2. Reduce the level of benefits which were guaranteed. *Id.* at 56, 57.

3. Authorize the PBGC to provide financial assistance to multiemployer plans experiencing temporary financial problems. *Id.* at 56.

4. Permit multiemployer plans experiencing financial difficulties to reduce benefit payments. *Id.* at 40.

5. Require faster funding of multiemployer plan obligations. *Id.* at 56.

6. Increase the premiums paid by multiemployer plans. *Id.* at 18, 137–63.

7. Impose upon a withdrawing employer a fixed liability equal to that employer's share of the plan's unfunded vested liability. *Id.* at 40, 57.

On February 27, 1979, the PBGC submitted a legislative proposal incorporating some of these ideas. This was followed on May 3, 1979, by the formal introduction in both houses of Congress of the legislation which ultimately became MPPAA. Because of the scope of the bill, Congress once again delayed the effective date of the 1974 mandatory guarantee program, this time until May 1, 1980. Pub.L. No. 96–24, 93 Stat. 70 (1979).

The House Education and Labor Committee favorably reported MPPAA on April 3, 1980. The Committee specifically agreed with the PBGC's assessment of the 1974 Act:

Under the existing termination insurance rules, guarantees are provided by the PBGC to participants in a terminated plan. Guarantee levels are high enough to result in coverage of virtually 100 percent of the vested benefits of participants in certain multiemployer plans. Employers who withdraw from a multiemployer plan more than five years before termina-tion have no further obligation to fund the liabilities of the plan, while employers who remain with a plan until it terminates, or withdraw within five years of termination are liable to PBGC for unfunded guaranteed benefits up to 30 percent of net worth.

In the case of a financially troubled plan, termination liability creates an additional incentive for employers to withdraw early. In such a plan, contribution increases may be escalating so sharply that termination liability may prove cheaper than continuing the plan. The remaining employers have an incentive to terminate the plan. Where active employees determine that benefits may be provided for them at considerably less cost than current contributions and are satisfied that vested benefits for retirees and others are virtually 100 percent covered by the guarantees, there is an incentive for the union to agree to terminate the plan. The result is to transfer the cost of providing benefits to the insurance system. The current termination insurance provisions of ERISA thus threaten the survival of multiemployer plans by exacerbating the problems of financially weak plans and encouraging employer withdrawals from and termination of plans in financial distress.

H.R.Rep. No. 96–869, Part I, 96th Cong., 2d Sess. 54–55, *reprinted in* 1980 U.S. CODE CONG. & AD.NEWS 2918, 2922–23 (hereinafter cited as *Education and Labor Report*); *accord, id.* at 60–61, *reprinted in id.* at 2928–29. The House Ways and Means Committee expressed similar views in its report released April 23, 1980. *See* H.R.Rep. No. 96–869, Part II, 96th Cong., 2d Sess. 15 *reprinted in* 1980 U.S. CODE CONG. & AD. NEWS 3004 (hereinafter cited as *Ways and Means Report*). On April 30, 1980, Congress for a third time delayed the implementation of the 1974 mandatory guarantees. This extension lasted until July 1, 1980. Pub.L. No. 96–239, 94 Stat. 341 (1980). Finally, on May 22, 1980, the House approved MPPAA by a vote of 374–0. 126 CONG.REC. 12,233–34 (1980).

Senate approval followed on July 29, 1980, but only after yet another extension—to August 1, 1980—of the PBGC's discretionary authority under the 1974 law. Pub.L. No. 96–293, 94 Stat. 610 (1980). The Senate vote in favor of MPPAA was 85–1. 126 Cong.Rec. S10169 (daily ed. July 29, 1980). Differences between the House and Senate versions were eventually reconciled in September of 1980[5] and President Carter's approval followed soon thereafter on the 26th of that month.[6]

The MPPAA effected a variety of major changes in ERISA. Under MPPAA, the PBGC is required to guarantee certain pension benefits of covered multiemployer plans. The level of benefits guaranteed by the PBGC under the MPPAA is lower than the level guaranteed prior to the passage of the MPPAA. The premiums employers must pay the PBGC for insurance are significantly higher under MPPAA. The PBGC is also authorized to provide financial assistance to plans which cannot meet their current financial obligations. This permits a plan which is having financial difficulties to continue, and allows employers to continue making contributions to an insolvent plan without incurring liability under ERISA. Under the MPPAA, the insurable event for a plan is its insolvency, rather than its termination. The MPPAA further provides that the plan benefits are to be funded over a shorter period of time than formerly required and requires arbitration to resolve a wide variety of disputes between trustees and employers.

For purposes of this appeal what is most significant is that on September 26, 1980, the rules governing an employer's withdrawal from an on-going multiemployer pension plan changed. No longer did such an event give rise, as it had under ERISA, to a contingent liability payable to the PBGC. Under MPPAA, an employer who withdraws must immediately begin to pay a fixed and certain debt owed to the plan.[7]

The details of this "withdrawal liability" are extremely complex. To obtain a basic grasp, it is important to realize that MPPAA regulates multiemployer plans of the "Taft-Hartley" variety. These plans are in reality trusts created by collective bargaining between a union and several employers. By law, the union appoints half the fund's trustees, and the employers appoint the other half. 29 U.S.C. § 186(c)(5)(B) (Supp. V 1981). The trust is funded by employer contributions which are made at a rate established by the terms of the collective bargaining contract. *Id.* This rate is usually expressed as an amount per time worked or product produced, *e.g.,* $.75 per hour or $1.50 per widget. The trustees collect the contributions and then determine, after considering all the constraints imposed by the contract and all applicable actuarial data, the level of benefits which can prudently be offered. All decisions as to benefits are within the sole province of the trustees. As a general rule, once an employer parts with its contribution, it retains no rights thereafter to determine how that money should be applied. *But cf. Borden, Inc. v. United Dairy Workers Pen. Program,* 517 F.Supp. 1162 (E.D. Mich.1981).

A plan's vested liability is the actuarial present value of the benefit obligations which have vested.[8] The difference be-

---

**5.** The House repassed its version 363–0 on August 26, 1980. 126 Cong.Rec. H7909 (daily ed.). The Senate approved a slightly different bill the same day. *Id.* at S11676 (daily ed.) A conference followed, with the Senate and House agreeing to the conference report on September 18 and September 19 respectively. *Id.* at S12901 (daily ed.); *Id.* at H9180 (daily ed.) (vote of 324–1).

**6.** A proposal to extend the PBGC's discretionary authority a fifth time failed on August 1. 126 Cong.Rec. H6984 (daily ed.). The 1974 mandatory program was thus ultimately in ef-

fect for less than two months, from August 1, 1980 to September 26, 1980, the date President Carter approved MPPAA.

**7.** MPPAA also provides for liability in certain cases of "partial withdrawal." *See* 29 U.S.C. §§ 1381, 1385 (Supp. V 1981).

**8.** An employee's right to collect a pension benefit is "vested" when it survives a pre-retirement termination of employment. *Nachman Corp. v. Pension Benefit Guaranty Corp.,* 446 U.S. 359, 363–64, 100 S.Ct. 1723, 1727–28, 64 L.Ed.2d 354 (1980).

tween this amount and the value of the plan's assets is called its unfunded vested liability. Under MPPAA, a withdrawing employer becomes liable on the date of withdrawal for a proportionate share of the latter figure. *Id.* at § 1382. The trustees have substantial discretion in deciding how much to assess any given employer or employers. Thus, the statute lists several different methods of allocating a plan's unfunded vested liability, and it further empowers the trustees to seek PBGC approval of a completely different method of their own design. *Id.* at § 1391. Under the "presumptive" method of section 1391(b), the liability is derived basically by multiplying the plan's aggregate unfunded vested liability by a fraction the numerator of which is the sum of all contributions required to have been made by the withdrawing employer during the previous five years. The denominator is the sum of all contributions made by all the employers during this same period. If disputes between an employer and the trustees arise over an assessment, they are to be resolved, at least initially, in arbitration. *Id.* at § 1401.

One final aspect of MPPAA is highly relevant to this case. Though its provisions take effect in general upon enactment, the withdrawal liability rules are expressly made retroactive to April 29, 1980. *Id.* at § 1461(e)(2)(A). Any employer that withdrew after this date and before MPPAA's enactment is thus liable on the same basis as those who left after the September 26, 1980 enactment date.

*B. The Parties*

Suit was brought here by a number of parties involved with the Local 705 International Brotherhood of Teamsters Pension Fund (the "705 Fund"), a multiemployer pension trust organized in Illinois and created pursuant to collective bargaining agreements between a variety of employers and employer associations and Teamsters Local 705. Plaintiffs-appellants include the 705 Fund itself; the eight trustees of the Fund; Local 705, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Local 705"); and four employer organizations, the Illinois Motor Truck Operators Association (the "IMTOA"), the Illinois Trucking Associations, Inc. (the "ITA"), the Cartage Exchange of Chicago, Inc. (the "CEC"), and the Motor Carriers Labor Advisory Council (the "MCLAC"), which are all nonprofit corporations which represent and engage in collective bargaining for member companies (collectively, the "Employer Associations or Organizations"). The IMTOA, ITA and CEC negotiated the original agreement establishing the 705 Fund, and the MCLAC became a party to the Trust Agreement in 1975. Local 705 appoints the employee trustees of the 705 Fund and the Employer Organizations appoint the employer trustees of the 705 Fund. The defendant-appellee PBGC is charged with implementing and enforcing Title IV of ERISA as amended by the MPPAA.

The 705 Fund was created through collective bargaining in 1954 and is now apparently one of the larger multiemployer plans in the country. The 705 Fund is funded solely by employers who are parties to collective bargaining agreements. The appellants allege that the provisions in the collective bargaining and trust agreements which limit the employers' obligations to the 705 Fund to making a negotiated contribution to the Fund have been instrumental in encouraging the employers to increase their contributions, in bringing about an increase in the plan benefits and in encouraging negotiation of contracts with respect to newly organized employers.

As of January of 1980, 15,733 workers were employed by 1,279 employers contributing to the 705 Fund. 6,900 of those workers had a nonforfeitable right to a pension benefit and approximately 4,300 additional participants had vested pension rights even though they were no longer employed by a contributing employer. On January 31, 1980, the 705 Fund owned assets having a market value of $174.7 million and had vested liabilities of $357.9 million, leaving a funding deficit of $183.2 million. During the fiscal year ending January 1980, the

Fund collected $29.8 million through contributions, earned $13.6 million more on investments and disbursed $17.2 million in benefit payments. In 1981, each participating employer contributed $51 per week per employee.

Historically, there has been some fluctuation in membership in the plan. During the five year period preceding January 1980, over 600 employers left the 705 Fund and more than 100 other companies joined. The number of active employees participating in the plan remained almost precisely uniform over this same period.

Appellants allege that between April 29, 1980 (the date when the withdrawal liability provisions of MPPAA first took effect) and September 26, 1980 (the date the MPPAA was signed into law), thirteen employers ceased contributing to the 705 Fund. Nine additional employers are alleged to have also ceased contributing between September 26, 1980 and December 31, 1980. The Employer Organizations further allege that some of their members have been seriously contemplating terminating their businesses. Because the contingent liability resulting from withdrawal must in all probability be disclosed in an employer's financial statements (thus presumably affecting its credit standing), these organizations and their members allege that the existence and operation of the MPPAA's allegedly unconstitutional provisions constitute a substantial injury to them.

The Trustees have not taken any of the steps required under the MPPAA to assess a withdrawal liability against the employers who have ceased contributing to the 705 Fund. The Trustees have instead joined with the 705 Local and the Employer Organizations in seeking a declaratory judgment that the withdrawal liability provisions of the MPPAA are unconstitutional.

## C. This Litigation

The district court first addressed the contentions of various *amici curiae* both that the plaintiffs in the case did not have constitutional standing to seek a declaratory judgment and that the case was insufficiently "ripe" for adjudication. The district court rejected the *amici's* arguments, finding that the Employer Associations had standing to contest the MPPAA on the basis of the actual liability which certain of their members had incurred under the Act due to their withdrawal from the 705 Fund, and on the basis of the injury suffered by all employer members who were forced to disclose their potential liabilities under the MPPAA in their public financial statements. The district court also rejected certain ripeness arguments, holding that because the case before it was a "facial" challenge to the validity of the MPPAA, the inadequacies of the factual record before the court were irrelevant.

The district court then turned to the substantive arguments before it. The court first considered the question whether the imposition of withdrawal liability upon an employer which had, prior to enactment, entered into an enforceable contract which apparently protected it from that type of liability violated due process. The court applied the framework of analysis developed by this court in *Nachman,* and found that no due process violation had been shown and that the Act was "rational" within the meaning of *Nachman.* The district court found that the MPPAA withstood both a rational basis analysis and the heightened scrutiny of contract clause analysis, and thus avoided a decision as to which mode of analysis was proper in this case. While stating that it was "an extremely close call," the district court also upheld the imposition of withdrawal liability upon employers which had withdrawn during the 150 day period between April 29, 1980, the date the withdrawal liability provisions were made effective, and September 26, 1980, the date President Carter signed the MPPAA into law.[9]

---

**9.** Following the lead of the district court, we shall refer to this period as the "retrospective period."

The court also rejected an equal-protection-based argument that the MPPAA irrationally imposed greater burdens on multiemployer plan businesses than on employers having their own plans, finding that Congress acted rationally despite its differing treatment of similarly situated entities. Plaintiffs' contentions that the MPPAA was unconstitutionally vague and that the mandatory arbitration required under the Act violated the plaintiffs' seventh amendment right to a jury trial were similarly rejected by the district court.

## II

### JUSTICIABILITY

■ Before we turn to the appellants' constitutional challenges to the statute, we must first address whether this case both presents a "case or controversy" within the meaning of Article III of the U.S. Constitution and is "ripe" for adjudication. Various *amici curiae* argued in the district court, and have renewed their arguments in this court, that there is no justiciable controversy because the plaintiffs have not challenged the validity of any acts of the defendant, the PBGC.[10] The amici also argue that this case is not "ripe," or within prudential limits on the adjudication of constitutional issues, because it is "abstract," lacks a complete factual record and has parties whose interests may not be "truly adverse." [11]

**10.** The amici contesting the issue of justiciability are all parties to other lawsuits contesting the constitutionality of the MPPAA.

**11.** The dissent, in the resolution of the justiciability issues presented here, gives insufficient weight to the stark adverseness of the parties. The PBGC has strenuously rejected the claim of unconstitutionality of the MPPAA, and has even sought and received a declaratory judgment on the merits of this claim in the district court. Appellants, on the other hand, have vigorously challenged the constitutionality of the MPPAA. While adverseness does not conclusively establish justiciability, it is important in evaluating whether the interests of the judicial process, as embodied in Article III's case or controversy requirement, are served by hearing the case on the merits. *See United States v.*

The Supreme Court has characterized the question of justiciability in an action under the Declaratory Judgment Act, 28 U.S.C. § 2201, as being one of "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). *See also J.N.S., Inc. v. Indiana*, 712 F.2d 303, 305 (7th Cir.1983). This is essentially the same standard as that provided by the basic constitutional minimum of standing which the Supreme Court has repeatedly articulated, namely, that a party must show a "distinct and palpable injury" which is "fairly traceable" to the conduct or statute being challenged. *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978); *Planned Parenthood Association v. Kempiners*, 700 F.2d 1115, 1118–23 (7th Cir.1983) (Cudahy, J., concurring). The question whether a challenge to the constitutionality of a statute is of sufficient immediacy and reality to permit a declaratory judgment is necessarily one of degree. *See* 10A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2757 (1983).

■ We think it clear that the district court was correct in concluding that the

*Johnson*, 319 U.S. 302, 305, 63 S.Ct. 1075, 1076, 87 L.Ed. 1413 (1943).

The fact that the PBGC sought summary judgment on the merits declaring the MPPAA constitutional supports our conclusion that this action fulfills Article III's case or controversy requirement. A suit *brought* by the PBGC against the trustees for a declaration that MPPAA is constitutional (and that the trustees must therefore assess withdrawal liability) would unquestionably present a justiciable controversy. By seeking judgment below, the PBGC effectively turned this into just such a case. In light of the posture of these parties, the fact that the appellants initiated the action is a mere technical consideration, which should not affect justiciability.

Trustees of the 705 Fund, the Fund itself and the Employer Organizations have all suffered and asserted sufficient harm and real or threatened injury to bring themselves within the class of parties which has standing to contest the constitutionality of the Act. All of these parties have "legal interests of sufficient immediacy and reality" to justify their standing in this case. In fact, the testing of the constitutionality of the MPPAA in the present context seems an almost classically appropriate application of the Declaratory Judgment Act.

The Employer Associations are organizations whose membership includes employers which have *actually* withdrawn from the 705 Fund, both during the retrospective period created by the MPPAA and after the MPPAA was enacted on September 26, 1980, and are thus liable for withdrawal liability if the 705 Fund acts in accordance with the statutory mandate of the MPPAA.[12] Actual injury was also suffered by employer members which were seriously contemplating withdrawal from the plan and which would have to disclose their potential liabilities on their financial statements, thus affecting their credit ratings.[13] We find that the Employer Associations have standing to challenge the MPPAA as representatives of the interests of their membership.

The Supreme Court has stated that: "It is clear that an organization whose members are injured may represent these members in a proceeding for judicial review." *Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). This recognition of "associational" standing does not obviate the constitutional requirements of a case or controversy, however; the association seeking to represent its membership in a suit must still "allege that its members, or any one of them, are suffering immediate or threatened injury of the sort that would make out a justiciable case had the members themselves brought suit." *Warth,* 422 U.S. at 511, 95 S.Ct. at 2211; *Rockford League of Women Voters v. United States Nuclear Regulatory Commission,* 679 F.2d 1218, 1221–22 (7th Cir.1982). Associational standing is particularly appropriate when the association is seeking to represent interests which are central to the purpose of the organization, *see* 13 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3531 at 214 (1975), and where the relief sought is some form of prospective remedy, such as a declaratory judgment, which will inure to the benefit of the organization's membership. *Warth,* 422 U.S. at 515, 95 S.Ct. at 2213.

**12.** The district court found that such member-employers did, in fact, exist and were current members of the Employer Associations. 539 F.Supp. at 1036 n. 19. We have no reason to question these factual findings and they have not been challenged by any of the parties or the *amici.* This is not a case, therefore, where determination of a statutory question—whether a withdrawal has in fact occurred—could obviate decision on the constitutional issues. *See Transport Motor Express, Inc. v. Central States, Southeast and Southwest Areas Pension Fund,* 724 F.2d 575 (7th Cir.1983).

The dissent does not appreciate the practical realities of this litigation. The trustees of the fund here recognized that the MPPAA requires them to assess withdrawal liability against the withdrawn employers. The trustees, believing the statute unconstitutional and potentially harmful to the fund, have elected to bring this action before assessing liability against the employers. The district court found that the employers were liable under the terms of the MPPAA. Thus, the employers seek a declaration which would effectively prevent the fund and the PBGC from assessing liability. This appears to be precisely the situation for which the Declaratory Judgment Act was designed, and, contrary to the dissent's contentions, this application of the Act is constitutional.

**13.** Nothing in the dissent persuades us that the district court erred by accepting the uncontroverted affidavits which spell out the effect of this contingent liability on the financial status of the employers. The affidavits of two financial experts establish that the contingent liability injures the employers. A favorable judgment in this case would relieve these employers of the burden of carrying this contingent liability on their books and would allow them to stop contributing to the fund without incurring withdrawal liability. We see nothing "abstract" or "illusory" in this injury or in the relief a favorable judgment would afford. *See Duke Power,* 438 U.S. at 75, n. 20, 98 S.Ct. at 2631, n. 20.

■ Associational standing is fully appropriate in this case. The Employer Associations negotiated the original agreement establishing the 705 Fund, have the power to appoint the employer trustees of the 705 Fund and continue to be the entities responsible for overseeing the employers' interests with respect to the 705 Fund. This involvement with the 705 Fund is a major facet of the Employer Associations' activities. Moreover, the role of the Employer Associations in this suit parallels the role which those entities have played with respect to the individual employers' relationship with the 705 Fund. As the entities responsible for ultimately overseeing the employers' interests with respect to the Fund, it is entirely fitting that these entities should represent the employers in this challenge to federal legislation affecting the 705 Fund.

■ We also believe that the district court correctly found that the eight individual trustees of the 705 Fund and the 705 Fund itself had standing in this case. The trustees and the 705 Fund are statutorily obligated to assess withdrawal liability from employers who withdraw from the Fund. 29 U.S.C. §§ 1382, 1399 (Supp. V 1981). These appellants have chosen not to comply with their apparent statutory obligation. They therefore face remedial efforts instituted by the PBGC and are thus in a position where they are directly concerned with the issue of the MPPAA's constitutionality.[14]

■ We agree with the district court's conclusion that Local 705's assertion of injury is too speculative to justify standing for Local 705. Local 705 argues that it has been injured in that its collective bargaining agreement has been altered by the MPPAA's withdrawal liability provisions, and thus the time and resources spent to negotiate its collective bargaining agreement have been wasted. We agree with the district court that any harm to, or interference with, the Local's bargaining agreement attributable to the MPPAA is rather conjectural or attenuated; while it is true that the withdrawal liability provisions might ultimately alter or harm the Union's bargaining position, this possibility is simply too remote to base standing upon at this time.

■ The *amici* also assert that the PBGC is not an appropriate defendant because the PBGC did not "cause" the injury suffered by the plaintiffs and because the entry of judgment against the PBGC could not prevent or cure the injury identified. Entry of judgment against the PBGC would deprive the PBGC of its ability to require the trustees of the 705 Fund to assess, and the members of the Employer Organizations to pay, withdrawal liability. Since this suit is, at core, an effort to avoid the imposition and payment of this liability, a decision for the appellants would eliminate the very real threat that the PBGC will seek to require the appellants to satisfy their respective obligations under the MPPAA. Thus, entry of judgment against the PBGC would cure precisely the injury asserted: Because the appellants appear to have chosen to disregard the apparent statutory mandate of the MPPAA, the only threat to the status quo lies in the PBGC's ability to require the appellants to follow the MPPAA. If the PBGC is prevented from doing this by a decision of this court, the appellants are freed from all possible threat of injury caused by the MPPAA. Therefore, the PBGC is certainly an appropriate defendant in this challenge to the constitutionality of the MPPAA.

There is also no credible argument that the PBGC is not an interested party in this

---

14. The dissent fails to appreciate the predicament in which the trustees find themselves. The MPPAA requires them to take action which they believe would harm the fund and would be unconstitutional. The PBGC has elected, according to its brief, to await the outcome of this case before instituting an action to compel the trustees to assess withdrawal liability. Further, the trustees, as fiduciaries, face potential personal liability if they act contrary to the interests of the fund. 29 U.S.C. § 1109. The Declaratory Judgment Act was adopted to relieve litigants of the choice between acting illegally and causing harm to themselves or others, at least where there is a colorable claim for relief. The injuries suffered by the trustees are thus ideally suited for redress in a declaratory judgment action.

dispute. The PBGC is the government agency which is ultimately responsible for administering and enforcing the MPPAA. The PBGC promulgates all regulations needed to implement the statute and, most importantly, has the power to bring civil actions to enforce all provisions of the MPPAA. The PBGC, in fact, stated in the district court that it was "very likely" that it would take such action if needed.

■ The related issue of ripeness is also argued by the appellants. Ripeness is a doctrine which courts use to enforce prudential limitations upon their jurisdiction.[15] The doctrine has been stated as having two major aspects, requiring a court to "evaluate" both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. *Pacific Gas and Electric Co. v. State Energy Resources Conservation & Development Commission,* —— U.S. ——, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983); *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). In the declaratory judgment context, the Court has stated that:

> The disagreement must not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them.

*Public Service Commission v. Wycoff Co.,* 344 U.S. 237, 244, 73 S.Ct. 236, 240, 97 L.Ed. 291 (1952). The Court has also stated that:

"'One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough.'" *Pacific Gas,* 103 S.Ct. at 1721, *quoting Regional Rail Reorganization Act Cases,* 419 U.S. 102, 143, 95 S.Ct. 335, 358, 42 L.Ed.2d 320 (1975).

■ We find this case ripe for adjudication. The issues presented by the case in its present posture are fully "fit" for our decision. There is no doubt that more issues involving the actual operation of the MPPAA would be before us if the parties had not initiated this suit until liability had been assessed, contested and arbitrated, but the potential existence of a different or more multifaceted case in the future cannot relieve us of the obligation to decide the case before us now. The district court characterized its decision as one deciding a "facial challenge" to the statute. Whatever characterization is given to the type of case before us,[16] we think that sufficient facts are presented to allow us to consider the core issue of the constitutionality of the withdrawal liability provisions of the MPPAA, at least as that issue affects the situation before us. This legal issue is one the resolution of which would be essentially unaffected by further factual development.

Unlike most of the cases involving challenges to the MPPAA, there is no pending or prematurely terminated liability proceeding in this case, raising substantial non-constitutional issues which might be required to be resolved before reaching constitutional issues. *See, e.g., Transport Motor Ex-*

---

**15.** The precise source of the ripeness doctrine is a matter which courts have largely ignored and commentators are in disagreement about. It is unclear to what extent the ripeness doctrine is derived from the "case or controversy" requirement of Article III and to what extent it is a judicially created tool for avoiding decisions in cases which a particular court may feel lack an "optimal" factual setting. *See* D. Currie, Federal Courts Cases And Materials, 90–103 (2d ed. 1975); P. Bator, P. Mishkin, D. Shapiro, H. Wechsler, The Federal Courts And The Federal System 145–46 (2d ed. 1973); 13 C. Wright, A. Miller & E. Cooper, Federal Practice And Procedure § 3532, at 240 (1975).

**16.** The parties have argued vigorously as to whether this is an "as applied" or "facial" challenge to the Act. Given the minimal or nonexistent record with respect to the actual operation of the MPPAA in the situation presented in this case, we do not think that the case can properly be considered an "as applied" challenge. *See Hodel v. Virginia Surface Mining & Reclamation Assoc., Inc.,* 452 U.S. 264, 297, 101 S.Ct. 2352, 2371, 69 L.Ed.2d 1 (1981). We do not need to pursue this question, however, since we do not think it has any bearing on our decision about the constitutionality of the MPPAA in the case before us.

*press, Inc. v. Central States, Southeast and Southwest Areas Pension Fund,* 724 F.2d. 575 (7th Cir.1983). The appellants here have chosen to raise an immediate challenge by suit against the PBGC rather than to await challenge by an employer in the context of a liability proceeding. While we in no way approve or disapprove of the strategic merits of this course of action, it is clear that there is no way for this particular case to reach a "fitter" stage.

This is also a case where substantial hardship would result if the court were to defer an opinion addressed to the key constitutional issues until another case should come along. The parties will all be vitally affected, in one way or another, by our decision. The nature of each party's injury in this case, *see* pp. 1259–1260 *supra,* is such that our decision is the only means of clarifying significant financial uncertainties. There are, moreover, literally hundreds of cases now pending in courts around the country which raise issues similar to those in the case before us. The progress of those cases, and judicial economy in general, may be materially enhanced by a ruling from this court.

We therefore find that this case is properly before the court. The appellants, except for local 705, have standing to contest the constitutionality of the MPPAA and the case is ripe for adjudication.

## III

## CONSTITUTIONALITY

The core issue presented by this case is whether Congress was within the bounds of its constitutional power when it enacted the withdrawal liability provisions which are at the heart of the MPPAA. The issue arises because of the MPPAA's impact upon private contractual arrangements which were already in existence at the time the MPPAA was enacted. The appellants argue that the Act impairs the collective bargaining and trust agreements, entered into prior to April 28, 1980, which do not impose upon an employer pension liability going beyond a negotiated contribution to the 705 Fund.[17] The precise question raised is whether employers who withdraw from multiemployer pension plans after September 26, 1980, may constitutionally be subjected to the withdrawal liability imposed by the MPPAA if the employer was party to an enforceable contract which ostensibly did not include this type of liability.[18]

### A. Due Process Analysis

We must initially decide the question of what constitutional standard governs federal legislation having an impact (after enactment) on existing contractual arrangements. The starting point for this analysis is the due process clause of the fifth amend-

**17.** The appellants allege that under the 705 Fund's trust agreement, the employers' "only obligations [to the 705 Fund] are to make timely contributions to the plan in the amounts and under the conditions set out in the collective bargaining agreement." The appellants rely upon Article 14 of the trust agreement for this. This provision of the trust agreement reads:

ARTICLE 14

Miscellaneous

*Section 1.* In no event shall an Employer, directly or indirectly, receive any refunds of contributions made to the Trust, except in case of bona fide mistake, and as to which contributions are returned within one year after payment of the contributions, nor directly or indirectly participate in the disposition of the Trust Fund or receive any benefits from the Trust Fund. Upon transfer to the Trustees, all responsibilities of the Employers

for each contribution shall cease, and the Employers shall have no responsibilities for the acts of the Trustees. No employee shall have any individual right, title, interest or claim against Employer, Employer's contribution, or the Trust Fund, except as may be expressly provided for in this Agreement or under federal law.

**18.** The case before us, because it involves both employers who withdrew from the 705 Fund during the retrospective period and employers who withdrew after September 26, 1980, actually involves two, somewhat distinct, levels of analysis. We first address the constitutionality of the MPPAA with respect to employers who withdrew after September 26, 1980, because, in our view, if the Act were unconstitutional with respect to this group, it would necessarily be unconstitutional with respect to employers who withdrew in the retrospective period.

ment.[19] Any "due process analysis properly begins with a discussion of the appropriate standard of review." *Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 82, 98 S.Ct. 2620, 2635, 57 L.Ed.2d 595 (1978). Appellants, and several of the *amici curiae,* argue that the due process clause is essentially coextensive with the contract clause [20] and thus that we should analyze this case in terms of the contract clause principles enunciated in such recent Supreme Court cases as *Energy Reserves Group v. Kansas Power and Light Co.,* —— U.S. ——, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983), *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978) and *United States Trust Co. v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). Appellee rejects this theory and argues that we must instead utilize the more deferential traditional standard of due process review applied in *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976).

This court's opinion in *Nachman Corp. v. Pension Benefit Guaranty Corp.,* 592 F.2d 947 (7th Cir.1979), a challenge to the constitutionality of provisions in ERISA imposing retroactive liability for the payment of unfunded vested pension benefits upon the termination of single employer pension plans, does not resolve this question. In *Nachman,* the court acknowledged that the question whether the due process clause and the contract clause in fact imposed identical restraints on the legislative impairment of contracts was subject to dispute. The *Nachman* court did not attempt to decide the issue, however, because it found that the challenged legislation in that case survived the heightened scrutiny of the contract clause, which necessarily meant that the legislation would also survive the more deferential test of the due process clause.

We find that the legislation before us is properly scrutinized under the traditional analysis of the due process clause and

that the contract clause is only indirectly relevant to the present case. The contract clause, on its face, applies only to laws passed by *States.* Historically, it appears that the clause was intended to prevent the various States from enacting debtor relief measures which unfairly interfered with the ability of creditors to collect debts during the economic depression which followed the Revolutionary War. *See Spannaus,* 438 U.S. at 256–57, 98 S.Ct. at 2728–29 (Brennan, J., dissenting); B. WRIGHT, THE CONTRACT CLAUSE OF THE CONSTITUTION 4–8 (1938). While it is clear that the contract clause has been applied in modern times to many areas other than "debtor relief" laws, it is also true that no Supreme Court case has yet held, or even suggested, that the contract clause is directly applicable to legislation of the *federal* government. *See Thorpe v. Housing Authority,* 393 U.S. 268, 278 n. 31, 89 S.Ct. 518, 524 n. 31, 21 L.Ed.2d 474 (1969). *See also United States Trust Co.,* 431 U.S. at 17 n. 13, 97 S.Ct. at 1515 n. 13 (indicating some differences between contract clause and fourteenth amendment due process clause analysis); *Duke Power Co.,* 438 U.S. at 83, 98 S.Ct. at 2635 (contrasting the due process clause test of "arbitrariness or irrationality" with the "elevated" or "intermediate" standard of the *United States Trust* contract clause case); *In re Gifford,* 688 F.2d 447, 457 (7th Cir.1982) (en banc) (stating "that the federal government may freely impair" contract rights) (the holding of *Gifford,* but not the reasoning on this point, was effectively rejected by *United States v. Security Industrial Bank,* 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1983)).

While a number of lower courts have touched on the relationship between the contract clause and the due process clause, there appears to, as yet, be no consensus emerging as to the proper role of the contract clause in due process analysis. Aside from *Nachman,* this court appears to have essentially ignored the contract clause when

---

**19.** "No person shall ... be deprived of life, liberty, or property, without due process of law...." U.S. Const. amend. V.

**20.** "No State shall ... pass any ... Law impairing the Obligation of Contracts...." U.S. Const. art. 1, § 10.

considering fifth amendment due process-based challenges to federal economic or social welfare legislation. *See, e.g., In re Gifford,* 688 F.2d 447, 457 (7th Cir.1982) (en banc); *Brach v. Amoco Oil Co.,* 677 F.2d 1213 (7th Cir.1982). The Sixth Circuit, in *A–T–O, Inc. v. Pension Benefit Guaranty Corp.,* 634 F.2d 1013 (6th Cir.1980), has indicated that it finds the contract clause applicable to a challenge to federal legislation only "to the extent that . . . contract clause principles may be incorporated into the Fifth Amendment" and has not specified that "extent." 634 F.2d at 1024 (citing *Nachman*). The Ninth Circuit, in *Northwestern National Life Insurance Co. v. Tahoe Regional Planning Agency,* 632 F.2d 104 (9th Cir.1980), has gone slightly beyond this tentative linkage and held that "the Fifth Amendment's due process clause provides essentially the same restraint against federal impairment of the obligation of contracts" as the contract clause. 632 F.2d at 106 (citing *Thorpe; Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934); and *Perry v. United States,* 294 U.S. 330, 350–54, 55 S.Ct. 432, 79 L.Ed. 912 (1935)). The majority of the cases dealing with the constitutionality of the MPPAA have simply ignored this issue, choosing instead to follow the *Nachman* analysis and thus avoiding the problem. *See, e.g., Shelter Framing Corp. v. Pension Benefit Guaranty Corp.,* 705 F.2d 1502 (9th Cir.1983);[21] *Republic Industries Inc. v.*

*Teamsters Joint Council No. 83 of Virginia Pension Fund,* 718 F.2d 628 (4th Cir.1983).

■ Our review of due process clause and the contract clause jurisprudence convinces us that these two constitutional provisions are by no means coextensive and rightly must be considered distinct. While there is no question that certain principles which have developed under the contract clause are applicable in due process analysis, we may not simply take the rash step of erasing the lines of demarcation between these two fundamental, far-reaching and *distinct* constitutional provisions—certainly not without a much clearer directive on this subject from the Supreme Court.[22] A wholesale and uncritical application of the contract clause to federal legislation would presumably result in a fundamental alteration of the role which the federal judiciary has played in the review of federal social welfare and economic legislation. Particularly given the state of uncertainty engendered by the Supreme Court's recent revitalization of the contract clause, *see* Note, *A Process-Oriented Approach to the Contract Clause,* 89 Yale L.Rev. 1623 (1980); Note, *Revival of the Contract Clause,* 65 Va.L.Rev. 377 (1979), we decline to take the course which appellants and *amici* urge upon us.

■ This is not to say that contract clause principles have no validity whatever in the context of a challenge to federal legislation. Particularly when the United

---

**21.** *Prob. juris. noted sub nom. Pension Benefit Guaranty Corp. v. R.A. Gray & Co.* and *Oregon-Washington Carpenters-Employers Pension Trust Fund v. R.A. Gray & Co.,* —— U.S. ——, 104 S.Ct. 271, 78 L.Ed.2d 253 (1983): *pet. for cert. filed sub nom. Carpenters Pension Trust v. Shelter Framing Corp.,* —— U.S. ——, 104 S.Ct. 270, 78 L.Ed.2d 252 (1983).

**22.** The Ninth Circuit in *Northwestern National Life Insurance* relied on *Thorpe v. Housing Authority,* 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), *Lynch v. United States,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934), and *Perry v. United States,* 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935). Our reading of these cases does not yield the conclusion reached by the Ninth Circuit. *Thorpe, Lynch* and *Perry* all involve situations where the United States it-

self was one of the contracting parties. These cases concern the special circumstance of the federal government's taking legislative action which impairs a contract to which it is a party. These cases cannot be utilized to draw out a general principle which is equally applicable to federal legislation affecting contracts between two private parties.

This court's decision in *Nachman* is not to the contrary. The court explained that it was unnecessary to decide whether contract clause scrutiny applied to federal legislation because the statute before it withstood such heightened scrutiny anyway. 592 F.2d at 959. The court reasoned that since the legislation withstood the more stringent of the two possible levels of scrutiny there was no reason to decide which level was appropriate. *Id.*

States is seeking to impair a contract to which it is a party, the mode of analysis under the due process clause apparently closely parallels contract clause principles. *See, e.g., Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934); *Perry v. United States,* 294 U.S. 330, 350–54, 55 S.Ct. 432, 434–36, 79 L.Ed. 912 (1935). In the context of federal legislation affecting private contractual relationships, however, we think that contract clause principles must be much more diffidently applied. The role of the federal courts is to ensure that Congress acts within its constitutional bounds, not to substitute their own judgment for Congress' as to the fairest solution to a social problem. The danger of heightened scrutiny, and the reason it has been as sparingly applied since its heyday in the *Lochner* era,[23] is that it can easily mask the imposition by a court of a philosophical and economic straightjacket on the legislature. Any level of judicial scrutiny beyond that of a traditional means-ends rationality analysis is thus dubiously applicable to regulatory legislation. Hence, these higher levels of scrutiny are at present normally applied only in narrow categories of cases such as controversies involving "fundamental" rights or where judicial supervision is required to prevent a distortion of regular democratic processes. *See United States v. Carolene Products Co.,* 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938). The case before us, involving legislative action in the field of national economic and social policy where Congress has traditionally been accorded wide discretion, does not merit or require the imposition of heightened scrutiny. We therefore find that the constitutionality of the MPPAA must be considered under the traditional "arbitrary and irrational" due process analysis of *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976).

In *Turner Elkhorn Mining* a group of coal mine operators brought suit to test the constitutionality of federal legislation requiring the operators to pay benefits for the death or disability of miners due to pneumoconiosis. The coal mine operators contended that the legislation violated the due process clause of the fifth amendment because it required them to compensate former employees who had left their employ before the legislation was passed. The operators apparently did not contest the imposition of such liability upon them for current and future employees. The Court stated:

It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.

\* \* \* \* \* \*

[O]ur cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. This is true even though the effect of the legislation is to impose a new duty or liability based on past acts.

428 U.S. at 15–16, 96 S.Ct. at 2892–2893 (citations omitted). The Court upheld the legislation as a rational measure to "spread the costs of the employees' disabilities to those who have profited." *Id.* at 18, 96 S.Ct. at 2893.

The Court in *Turner Elkhorn Mining* followed longstanding precedent. In such cases as *Calhoun v. Massie,* 253 U.S. 170, 40 S.Ct. 474, 64 L.Ed. 843 (1920); *Lichter v. United States,* 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948), and *Norman v. Baltimore & Ohio Railroad Co.,* 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885 (1935), the Court consistently applied the principle that: "Contracts, however express, cannot fetter the constitutional authority of the Congress." *Norman,* 294 U.S. at 307, 55 S.Ct. at 415. This court, in *Brach,* also recognized this fundamental principle that: " 'So long as the Constitution authorizes the subsequently enacted legislation, the fact that

---

**23.** *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905).

its provisions limit or interfere with previously acquired rights does not condemn it." *Brach*, 677 F.2d at 1224, *quoting F.H.A. v. The Darlington, Inc.*, 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958).

█ But the Court in *Turner Elkhorn Mining* also noted that "[i]t does not follow, however, that what Congress can legislate prospectively it can legislate retrospectively." 428 U.S. at 16, 96 S.Ct. at 2892. In cases where the legislation in question has retroactive effect, special care must be taken in applying the "arbitrary and irrational" test to determine if there was indeed justification for the added burden which retroactive legislation imposes on those it regulates. In *Turner Elkhorn Mining*, the Court in no way indicated some special distaste for retroactive legislation, but merely stated that not only must legislation as a whole be rational and non-arbitrary but also that any retroactive aspects of the legislation must, in particular, be rationally and non-arbitrarily related to legislative goals.

One *amicus curiae* argues here that *Railroad Retirement Board v. Alton Railroad Co.*, 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935), is more closely analogous to the case before us than *Turner Elkhorn Mining*. In *Alton Railroad,* the Court held that the compulsory retirement and pension system created by Congress to cover workers in the railroad industry was unconstitutional. The Court found several provisions of the legislation to violate the due process clause, including a provision that required railroads to pay pensions to individuals whose employment had ended prior to enactment of the statute and who had not at that time been entitled to pensions. For several reasons, we find *Alton Railroad* to be unpersuasive with respect to the case before us. First, it is unclear whether *Alton Railroad* retains any vitality after *Turner Elkhorn Mining.* While the Court in *Turner Elkhorn Mining* purported to distinguish that case from *Alton Railroad* on the basis that the benefits in *Turner Elkhorn Mining* addressed "specific needs created by the dangerous conditions" of mining employment,

this does not conclusively settle the issue. The Court's method of analysis in *Turner Elkhorn Mining* represents a fundamental shift from that employed in *Alton Railroad.* Not only did the Court explicitly question the continued vitality of *Alton Railroad*'s due process analysis, 428 U.S. at 19, 96 S.Ct. at 2894, but it also employed a mode of analysis substantially more deferential to legislative action than that employed in *Alton Railroad.* The case before us is also factually distinguishable from *Alton Railroad.* As we noted in *Nachman,* in *Alton Railroad* the employer had never agreed to pay any retirement benefits at all. *Nachman,* 592 F.2d at 962. In the case before us, on the other hand, the employers had previously agreed to fund pension benefits, albeit in a lesser amount than the requirements imposed by the MPPAA.

█ Applying the principles developed in *Turner Elkhorn Mining* to the MPPAA, it is clear that the withdrawal liability provisions of the Act survive due process scrutiny. Since the enactment of ERISA in 1974, Congress has recognized the special problems posed by multiemployer pension plans. Congress, and the administrative agency created by Congress to administer federal action in the area, spent several years extensively studying these problems. Because there is no indication that Congress' chosen solution, the withdrawal liability provisions of the MPPAA, are either irrational or arbitrary solutions to the problems identified, we hold that these provisions are constitutionally sound.

Congress' study of multiemployer pension plans revealed that the financial stability of these plans was threatened by the funding patterns under which the plans operated. A multiemployer plan whose future pension commitments have been only partially funded by employer contributions—including the contributions of withdrawn employers—would have to look to some source of funding to make up for any deficiency attributable to the withdrawn employer. In the absence of imposition of withdrawal liability or, conceivably, a contribution from general tax revenues, this deficiency would

in normal course become the responsibility of employers remaining in the plan. The PBGC study of the problem indicated that the obvious risk of added burdens upon employers who remained as participants in plans might induce more of them to remove themselves from multiemployer plans. This process could discourage the entry of new plan participants and precipitate the financial failure of less stable plans. Congress agreed with this analysis, expressly finding that:

> withdrawals of contributing employers from a multiemployer pension plan frequently result in substantially increased funding obligations for employers who continue to contribute to the plan, adversely affecting the plan, its participants and beneficiaries, and labor management relations . . . .

29 U.S.C. § 1001a(a)(4)(A) (Supp. V 1981).

After extensive hearings and consideration of the problem, Congress chose a solution which placed the initial burden of sustaining plan stability on withdrawing employers. The imposition of withdrawal liability upon employers who are leaving plans was chosen as the most effective measure both to reduce an employer's incentives to withdraw from a multiemployer plan and to offset the burden otherwise shifted to the remaining employers when a withdrawal nevertheless occurs. The basic question is whether this response to the present or potential financial problems of multiemployer plans is irrational. If, at the time of withdrawal of a participating employer, the current value of fund assets falls short of the vested benefit liability, is it fair to assess the withdrawing employer with its aliquot share of the deficiency?

First, one may ask whether this calculation of the deficiency in value of the assets is a meaningful basis for requiring from *any* source a contribution to the fund. One may argue that this deficiency may in due course disappear through appreciation in value of the fund assets. Or it may be reduced in time by a flood of new employee participants as to whom employer contributions will be required without a contempo-

raneous offsetting increase in employees whose benefits are vesting. On the other hand, if the value of fund assets does not appreciate or if employees whose benefits vest increase out of proportion to the increase of young employees for whom contributions are being made, then the deficiency in value of fund assets may grow worse. A third factor which also obviously affects the rise and fall of the unfunded liability is the liberality or conservatism with which the level of benefits is fixed. Of course, the entire calculus is significantly affected by life expectancy assumptions and by present-value calculations involving interest rate assumptions.

All this helps to explain why the concept of unfunded vested liability involves a dynamic process. When we attach a number to this concept at a particular point in time we are taking a still picture of a moving target. But Congress was certainly not acting irrationally in requiring that such a still picture be taken. Given the dynamic nature of the process coupled with the need to appraise it at a particular moment in time, the method chosen to measure the liability is, if not the best available, certainly not without a sturdy basis in logic.

And the choice of the time of withdrawal for assessing the liability is far from irrational. It is at this time that Congress apparently believed the proposed withdrawer should be confronted with the immediate prospect of assuming the economic burden of providing an actuarially sound backing for the promised pensions. Only when that burden becomes part of the choice of the proposed withdrawer, can that choice be made with appropriate concern for the economic expectations of the beneficiaries of the plan. If the burden is contingent or long-deferred, the employer choice may not take it adequately into account. This may lead to unwarranted withdrawals, resulting economic decline of the plan and a domino effect of further and ever more disruptive employer withdrawals.

Appellants also argue that there was no "hard" evidence available to Congress concerning the "true" risks which withdrawals

posed. Appellants note that the financial projections which Congress utilized were based upon "computer projected models" and appear to argue that Congress should not have acted until more empirical evidence was available.

We perceive no merit in this argument. Congress has no obligation to wait until a potential problem matures into an actual crisis before enacting corrective legislation addressing the problem. Congress acted rationally in choosing to try to forestall future pension crises involving millions of workers by essentially forcing withdrawing employers to fully fund future pension liabilities. Congress also did not act arbitrarily in fashioning the MPPAA to apply to plans which are currently financially stable as well as to plans in a more precarious financial state. The various moderating features of the MPPAA, such as exclusions from the definition of withdrawal, the partial exemption of certain industries and the *de minimis* exemptions, indicate that Congress attempted to impose the burdens of the legislation only to the extent necessary to achieve its legislative objective.

In sum, there is no indication that the congressional response to the problem of financial stability of multiemployer pension plans is either irrational or arbitrary. We have not sought to determine whether a different legislative scheme would be more effective or wiser—that question is not one of constitutional significance. *Turner Elkhorn Mining,* 428 U.S. at 19, 96 S.Ct. at 2894. Rather, we have determined that the MPPAA rationally furthers legitimate Congressional concerns and we thus find that the withdrawal liability provisions of the MPPAA do not contravene the due process clause of the Constitution.

Although the appellants do not separately address the issue, we think that the operation of the MPPAA with respect to employers who withdrew during the retrospective period, or between April 29, 1980 and September 26, 1980, merits special attention. As the district court noted, employers who withdrew from plans during this 150-day period found that the law governing their withdrawal liability changed after the fact. When they withdrew from a particular plan, their liability was contingent upon the plan's terminating within five years under the provisions of ERISA. On September 26, 1980, however, when the MPPAA was signed into law, their withdrawal liabilities became fixed and payable. Given the constitutionality of withdrawal liability for employers who withdraw after the MPPAA's enactment date, the question presented is whether it is constitutionally irrational and arbitrary also to impose liability upon employers who withdraw during the retrospective period before the enactment of the MPPAA.[24]

---

**24.** The two courts of appeals that have considered this issue have disagreed over whether due process is violated by application of the MPPAA's withdrawal liability provisions to an employer who withdrew during the retrospective period. *See Shelter Framing Corp. v. Pension Benefit Guaranty Corp.,* 705 F.2d 1502 (9th Cir.1983) (holding MPPAA unconstitutional) *and Republic Industries, Inc. v. Teamsters Joint Council No. 83 of Virginia Pension Fund,* 718 F.2d 628 (4th Cir.1983) (holding MPPAA constitutional). The Ninth Circuit explicitly confined its holding to liability for withdrawals during the retrospective period. 705 F.2d at 1502–03, 1515. The Fourth Circuit appeared to uphold the constitutionality of assessing withdrawal liability for withdrawals both during and after the retrospective period although it only had before it an employer which had withdrawn during the retrospective period. *Republic,* at 631, 633. Because both courts examined the statute under the *Nachman* contract clause

analysis, we defer our discussion of those cases. *See* pp. 1271–1274 *infra.*

In addition to the split in the circuits represented by the Fourth and Ninth Circuits' disagreement in *Shelter Framing* and *Republic Industries,* the district courts of the Northern District of Illinois have been unable to agree on the constitutionality of MPPAA. For example, Chief Judge McGarr of the Northern District recently held, contrary to Judge Getzendanner's conclusion in this case and to Judge Flaum's conclusion in *Transport Motor Express v. Central States Pension Fund,* No. 81 C 4535 (N.D.Ill. May 18, 1983), *rev'd on other grounds,* 724 F.2d 575 (7th Cir.1983), that the "retroactive imposition of withdrawal liability under the MPPAA violates the due process clause of the fifth amendment." *National Steel Service Center, Inc. v. Central States, Southeast and Southwest Area Pension Fund,* No. 82 C 5315, slip op. at 9 (N.D.Ill. Nov. 23, 1983). Of course, the conflict among the circuits is in the process

It is unquestionable that this "retrospective liability" imposes some added burdens upon the employers that it affects. To some extent, the statute changes the legal effects of a "closed transaction"—the employer's withdrawal. An employer's decision to withdraw during the retrospective period was presumably made based upon the employer's understanding of the current law governing such a transaction. The MPPAA, by virtue of its retrospective effect, could be viewed as changing that situation, leaving the employer with a final decision whose effects are possibly quite different from what was contemplated at the time the decision was initially made.

We must examine this aspect of the MPPAA under the same criteria we utilized with respect to the post-enactment operation of the statute. While we recognize the general disfavor in which our law holds legislation with retrospective effect, it is clear that the constitution "does not prohibit retrospective civil legislation, unless the consequences are particularly 'harsh and oppressive.'" *United States Trust Co. v. New Jersey,* 431 U.S. 1, 17 n. 13, 97 S.Ct. 1505, 1515 n. 13, 52 L.Ed.2d 92 (1977), *quoting Welch v. Henry,* 305 U.S. 134, 147, 59 S.Ct. 121, 125, 83 L.Ed. 87 (1938). Thus we must apply the *Turner Elkhorn Mining* rationality test to this aspect of the MPPAA, with particular attention to whether the imposition of liability during the retrospective period is so "harsh and oppressive" that the retrospective application of the statute must be declared unconstitutional.[25]

 We think that two factors clearly indicate that the retrospective aspect of the MPPAA also survives due process scrutiny. First, it was rational for Congress to conclude that it was necessary to impose the added burden of retrospectivity to fully effectuate Congress' purpose in enacting the MPPAA. The district court found that Congress was concerned that one of the many flaws in ERISA which Congress was seeking to correct—possible encouragement of early withdrawal—might have been exacerbated if the MPPAA had not included a retrospective date of effectiveness. *Peick,* 539 F.Supp. at 1055. Congress was concerned that employers would be encouraged to withdraw while the legislation was under consideration if the statute became effective only upon enactment. *Id.* Congress carefully tailored the retrospectivity provisions of the act so as to minimize the concerns caused by these provisions. The bill originally introduced in May of 1979 had an effective date of February 27, 1979, which was the date of the PBGC's recommendations to Congress. As the legislation progressed through the legislative process this date was moved forward so that the final date chosen would encompass the minimum time period which Congress thought necessary to prevent abuse. April 29, 1980, the date finally chosen by Congress as the initial effective date for the MPPAA, was the date by which the bill had evolved into what was essentially its final form.

Second, as this brief recitation of legislative actions involving retrospectivity indicates, the intent of Congress to provide for the retrospective imposition of liability was quite clear from the very beginning of the legislative process. At all times during the retrospective period, employers were fully aware that not only were they already obligated for a species of termination liability under ERISA's contingent liability provisions, but that it was also extremely likely that they would become liable under the MPPAA when it was finally enacted. Thus, the employers who withdrew during this period cannot argue that they are now being required to pay wholly unanticipated liabilities.[26]

of resolution by the Supreme court, *see supra* note 21.

**25.** To the extent that this heightened level of scrutiny approaches the type of analysis utilized in contract clause-based cases, we apply this analysis to the operation of the MPPAA in the retrospective period in the *"Nachman"* section of the opinion. *See* pp. 1271–1274 *infra.* The *Alton Railroad* case is also relevant to this issue. *See* the discussion of that case at p. 1266 *supra.*

**26.** As the district court noted, § 4207 of the MPPAA, 29 U.S.C. § 1387(b) (Supp. V 1981), is also highly relevant in this regard. Section

Given these circumstances, we find no breach of the Constitution in Congress' rational decision to provide for an effective date prior to final enactment of the legislation. This legislative scheme has been previously employed and sanctioned, *see United States v. Darusmont,* 449 U.S. 292, 101 S.Ct. 549, 66 L.Ed.2d 513 (1981); *United States v. Hudson,* 299 U.S. 498, 57 S.Ct. 309, 81 L.Ed. 370 (1937), and this approach appears appropriate and necessary in this instance. We hold that the retrospective period of withdrawal liability imposed by the MPPAA also does not violate the Constitution.

*B. Nachman Analysis*

■ Although we have decided that traditional due process analysis should govern the decision of this case, even if we were to follow the stricter contract clause analysis utilized by this court in *Nachman,* we would find that the MPPAA's withdrawal liability provisions, with respect both to applications during the retrospective period and applications after September 29, 1980, survive *Nachman*-type scrutiny. While it is obviously a much closer case, we think that Congress has sufficiently tailored its legislative action in such a way that "the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's adoption.]'" *Energy Reserves,* 103 S.Ct. at 705, *quoting United States Trust Co. v. New Jersey,* 431 U.S. 1, 22, 97 S.Ct. 1505, 1517, 52 L.Ed.2d 92 (1977).

The starting point for this type of analysis is this court's opinion in *Nachman Corp.*

*v. Pension Benefit Guarantee Corp.,* 592 F.2d 947 (7th Cir.1979), *aff'd,* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980).[27] As discussed, *see* pp. 1262–1263 *supra, Nachman* employed contract clause principles in its analysis of whether the termination liability provisions of ERISA violated due process. Appellants argue first that the *Nachman* court incorrectly interpreted recent Supreme Court precedent concerning the contract clause and utilized too lenient a contract clause standard. The gist of appellants' argument is that the Court's opinion in *Allied Structural Steel v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), indicated that impairments of private contracts were to face as strict scrutiny as state impairments of their own contracts faced under the Court's opinion in *United States Trust.* Appellants thus argue that we must apply a stricter scrutiny to the MPPAA than this court utilized in *Nachman.*

We find no merit whatever in appellants' argument. While some commentators appear to have thought at one time that *Allied Steel* intended to extend the strict level of scrutiny articulated in *United States Trust* to all contract clause cases, *see* Schwartz, *Old Wine in Old Bottles? The Renaissance of the Contract Clause,* 1979 Sup.Ct.Rev. 95, 110, 121, the Court's recent opinion in *Energy Reserves Group* makes it clear that this was not the case. *Energy Reserves Group* very clearly indicates that the Court continues to view the contract clause as requiring two different levels of analysis depending upon whether a State is one of the contracting parties.[28] We thus

1387 requires the PBGC to pass regulations by which a withdrawn employer can reduce or eliminate its liability by reentering its plan. Thus, if an employer feels that it has been harmed by its reliance on existing law at the time of the withdrawal, this provision would seem essentially to allow the employer to return to its former status.

**27.** The Supreme Court affirmed *Nachman,* but reviewed only the nonconstitutional questions presented. *Nachman Corp. v. Pension Benefit Guaranty Corp.,* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980).

**28.** "Unless the State itself is a contracting party, [citing *United States Trust* ], '[a]s is customary in reviewing economic and social regulation ... courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.'" *Energy Reserves Group,* 103 S.Ct. at 705–06, *quoting United States Trust,* 431 U.S. at 22–23, 97 S.Ct. at 1517–1518.

The Court explained *Allied Steel* as being based upon the fact that the challenged Minnesota pension law was not intended to "meet an important general social problem" but was rather being "aimed at specific employers" or

think that *Nachman* correctly chose to employ the more deferential standard of contract clause analysis.

*Nachman* identified four factors to be considered in determining whether legislation satisfied contract clause/due process standards. These factors were: 1) "the reliance interests of the parties affected"; 2) "whether the impairment of the private interest is affected in an area previously subjected to regulatory control;" 3) "the equities of imposing the legislative burdens;" and 4) "the inclusion of statutory provisions designed to limit and moderate the impact of the burdens." *Nachman*, 592 F.2d at 960. In general, we approve and adopt the district court's thorough and insightful analysis and application of the *Nachman* factors to the case before us. The district court found that the decision of Congress to subordinate the reliance interests of employers to those of employees was rational; that the extensive federal regulation of pensions which existed even prior to the MPPAA made less reasonable and compelling the employers' reliance upon existing rights; that the basic structure of the statute was not so inequitable that it could not withstand a facial attack upon its validity; and that there were sufficient moderating features in the statute to evidence a congressional attempt to "impose liability only to the extent necessary to achieve the legislative purpose." *Peick,* 539 F.Supp. at 1038–52, *quoting Nachman* 592 F.2d at 962.

The application of the *Nachman* analysis to the full sweep of the MPPAA's withdrawal liability provisions is apparently a matter of first impression in the courts of appeals. The Ninth Circuit, in *Shelter Framing,* applied these factors and found that imposition of liability for withdrawals during the retrospective period was unconstitutional, but specifically took "special care to note that [its] holding applies only to those employers who withdrew before the enactment of the Amendments Act" and expressed "no opinion as to the consti-

tutionality of the imposition of liability on employers who withdrew after September 26, 1980." *Shelter Framing,* 705 F.2d at 1514–15. The Fourth Circuit, in *Republic Industries* applied the *Nachman* analysis and upheld the imposition of withdrawal liability against an employer that withdrew before September 26, 1980. It is unclear whether the court intended its ruling to foreclose any similar challenges brought by employers which withdrew after September 26, 1980.

The first factor to be addressed under the *Nachman* analysis is the reliance interests of the parties. In this case, this factor seems intertwined with the second factor—whether impairment of the private (employer's) interest is affected in an area previously subjected to regulatory control. In any event, evaluation of the reliance interests involves a balancing of the employees' reliance on receiving vested pension benefits with an employer's reliance on its expected right to terminate participation in a pension plan without incurring any additional obligation to fund those benefits. The balance in this case is quite similar to that considered in *Nachman.* Here, as in *Nachman,* the employees had a strong and justifiable expectation that they would receive the *vested* pension benefits to which they had become entitled for their years of service. Withdrawal liability for terminating employers is a rational means of ensuring that multiemployer plans will not be rendered insolvent or incapable of meeting their obligations by withdrawing employers. The district court found, and we agree, that Congress had sufficient evidence before it to indicate that corrective measures were necessary and that some form of withdrawal liability would be effective. *See also Republic Industries,* at 638 (attaching "heavy weight" to employees' reliance interests).

The employers' side of the reliance balance is also important, but we find it to be less compelling than that of the employ-

---

"may have [even] been directed at one particular employer ..." *Energy Reserves Group,*

103 S.Ct. at 705 n. 13.

ees. Employers have a substantial interest in certainty with respect to pension liabilities, but, as the *second Nachman* factor indicates, employer reliance upon contractual limitations on pension liability are necessarily tempered by the knowledge that these contracts are subject to the extensive federal regulation which pervades the field of pensions. Multiemployer plans, even before the MPPAA, were subject to regulation under ERISA, the Internal Revenue Code, the Labor Management Relations Act of 1947 and the Welfare and Pension Plans Disclosure Act of 1958. Employers can hardly claim at this late date that they had a justifiable expectation that the federal government would not seek to intervene if it appeared that their private pension arrangements were insufficient or inadequate.[29]

These reliance and federal regulatory factors, as in *Nachman,* serve to fully distinguish this case from *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). In *Allied Steel,* the Court invalidated a Minnesota statute which imposed liability on employers for the payment of unfunded benefits, *vested by operation of law,* upon the termination of a private pension plan. In *Nachman* and the case before us, the liability imposed on employers is based upon *contractually* vested pension benefits. This difference means that the employees' reliance interest here is much greater than the like interest in *Allied Steel,* where the employees covered by the Minnesota legislation had no contractually vested rights. Another major distinction between the present case (and *Nachman* ) and *Allied Steel* is the prior existence of federal regulation in the pension area in contrast to the absence of such regulation in Minnesota. Finally, the Court in *Allied Steel* found that the law in question "was not even purportedly enacted to deal with a broad, generalized economic or social problem." *Allied Steel,* 438 U.S. at 250, 98 S.Ct. at 2725. In the case before us there can be no doubt that Congress intended to address what it thought to be a social problem with wide-ranging impact.

The Ninth Circuit, in considering the employer-employee balance, found the reliance factors to weigh in favor of employers, mainly on the grounds that the employers' reliance on prior law was the most important such factor to be considered. This view was based upon the Ninth Circuit's finding that an employer could not have known, at the time his decision to withdraw was made (during the retrospective period), what form the final version of the MPPAA would take. The Ninth Circuit also found the employees' reliance interest in any single employer's withdrawal liability to be relatively insignificant. *Shelter Framing,* 705 F.2d at 1511–12.

We agree with the Fourth Circuit that the Ninth Circuit's concern for an employer's reliance on prior law does not reflect reality. *Republic Industries,* at 638. During the period between April 29 and September 26, 1980, it was clear to anyone concerned about multiemployer pension plans that employers would be subjected to withdrawal liability under the MPPAA. At most, an employer could claim only uncertainty as to the details of this liability, not that the liability was a surprise. An effective date for the legislation prior to enactment was a feature of the MPPAA from the day it was introduced. We thus think that employers had no reasonable basis to expect that they could withdraw after April of 1980 from multiemployer pension plans without incurring the type of liability contemplated under the MPPAA. On the other hand, employees never had any cognizable reason not to believe that their contractually vested pension benefits would not be paid. Their expectations for their retirement years were both real and reasonable (as well as crucially important). Further, we think the Ninth Circuit's view that employees had only a slight reliance interest in any single employer's withdrawal liability to be wholly unrealistic. The non-imposition of any single employer's withdrawal

---

**29.** The Fourth and Ninth Circuits also found the fact of prior regulation to weigh in favor of constitutionality. *Republic Industries,* at 639. *Shelter Framing,* 705 F.2d at 1512.

liability might be the straw that broke the camel's back—if the plan foundered. Who is to say which brick of the thousands forming the edifice of a stable pension plan is without importance, or not to be relied upon?

In sum, we agree with the Fourth Circuit in *Republic Industries* and the district court in this case that the employees' reliance on their employers adequately funding their pension plans outweighs any reliance interest the employers may have had in withdrawing from a plan with impunity.

■ The third *Nachman* factor involves an examination of the basic equities of imposing withdrawal liability upon employers. This factor is closely tied to the fourth *Nachman* factor—the degree to which the burdens of the legislation are moderated by any limiting features of the statute. As our discussion with respect to due process indicates, we think that, on balance, the burden imposed on individual employers by the MPPAA is reasonable when weighed against Congress' goals and objectives in enacting the MPPAA. *See* p. 1267 *supra.* To the extent that the *Nachman*/contract clause analysis would commend a less deferential scrutiny of the equities involved, we think that the equitable balance is closer, but still it leans toward the justification of withdrawal liability.

As we have discussed, a pension funding program which results in unfunded vested benefits necessarily raises the issue of *who* is to fund these liabilities. This is a complex issue, affected by such factors as the degree to which past participants continue in a plan, the value of plan assets, general economic trends and decisions as to the level of benefits to be paid to plan beneficiaries. There are undoubtedly flaws in Congress' chosen means of dealing with the issue. The blanket imposition of withdraw-

al liability may well result in protection which eventually proves to be beyond the needs of particular plans. Withdrawal liability may also impose a substantial financial burden on employers at a point when they are least capable of meeting it—when they are liquidating or closing a business. But liquidation is a risky and unpredictable affair, as everyone in business knows.

■ We see no disabling inequity in imposing withdrawal liability on employers when the pension plans they have joined voluntarily turn out to be underfunded. It is true that an individual employer may not have much influence on many important decisions which affect a plan's financial stability. But, of course, this is the arrangement the employer entered into, and it is the employers' contributions that have been inadequate to keep the vested liabilities fully funded. And given this, the fact remains that we are not to evaluate whether Congress chose the "best" solution to a given problem. Our role is simply to evaluate *rationality*, and the Supreme Court's recent decision in *Energy Reserves* makes clear that that evaluation must be based on proper deference to the decision of the legislature. There is certainly a burden imposed on employers by the MPPAA. But what would be the alternative burden on workers entering into retirement with underfunded or non-existent pensions? Congress has the primary task of equitably distributing the burden of underfunded pensions, and we cannot say that Congress' choice is an inequitable one. *See Republic Industries*, at 639.

■ A similar analysis must be made with respect to the moderating features of the MPPAA. The MPPAA does contain a variety of features that limit the standard of when a "withdrawal" occurs,[30] mitigate

---

**30.** Congress apparently made some attempt to limit the definition of "withdrawals" to events that could actually harm the contribution base of plans. Thus, a sale of assets may not trigger withdrawal if the purchasing party contributes to the plan, 29 U.S.C. § 1384 (Supp. V 1981); certain industries have particular definitions of withdrawal based upon their specialized needs, *id.* §§ 1383(b)(2)(B), 1383(c)(1); plans may pe-

tition the PBGC for permission to adopt particularized withdrawal rules, *id.* § 1383(f); and "free look" provisions allow new plan participants to withdraw without liability within a certain limited time, *id.* § 1390.

The Fourth Circuit, in *Republic Industries,* found that these ameliorating factors together with *de minimis* exemptions outlined in note 31

the amount of liability imposed[31] and reduce or eliminate liability if an employer either resumes operations after a complete withdrawal, 29 U.S.C. § 1387 (Supp. V 1981), or increases its contribution base units after a complete withdrawal. *Id.* § 1388. The MPPAA, however, does not have the 30% of net worth limitation contained in ERISA, which is surely a moderating feature. But this sort of ceiling has the obvious disadvantage of being unrelated to the needs of the plan as measured by the unfunded vested liability. And moderation of this liability through a ceiling may result in shifting the potential burden to continuing employers or to the employees by way of the diminished security of their pensions.

In addition, however, we recognize that the MPPAA does not appear to contain provisions which would moderate withdrawal liability unless the financial circumstances of the plan in question were particularly parlous. The argument for such moderation is made to us: Why impose the onerous withdrawal liability unless a plan is clearly headed for termination or disaster? The answer seems to be that termination or disaster, or escape from termination or disaster, is rarely predictable with certainty. And it is not irrational—it is in fact merely financially conservative—to measure financial health by the unfunded vested liability, even though the ultimate life-span of the plan may be unpredictable. Further, the burden of seemingly inadequate funding must be borne by someone—the withdrawing employer, the continuing employer or, in the ultimate event, the employee. With these cautionary observations, we note the comment of the district court that the absence of some means of providing substantial relief from liability in the case of withdrawal from a "healthy" fund tends to raise some concern as to whether the statute indeed only imposes "liability to the extent necessary." *Peick,* 539 F.Supp. at 1051.

The Ninth Circuit found both the equities and the extent of the moderating provisions to weigh against constitutionality of the retrospective provisions. Although a case may be made for inadequacy of moderating provisions, it may only be made at the expense of the continuing employers or the security of the employees' pensions. And we do not agree that the equitable balance in the case weighs against constitutionality. The Ninth Circuit found that the effective date of April 1980 was arbitrarily selected, that there was no showing of need to justify the imposition of liability which threatens the solvency of employers, and that other legislative programs could have served the same purpose of ensuring the financial health of multiemployer plans. *Shelter Framing,* 705 F.2d at 1512–15. As discussed above, we think that the selection of the April 1980 effective date was reasonable and that there was abundant evidence of need to justify Congress' imposition of liability. The availability of alternative solutions is only relevant to the extent that an alternative solution might indicate the unconstitutionality of Congress' chosen decision. Because we do not think that any alternative has been proposed which bears on constitutionality, we disagree with the Ninth Circuit's conclusion that the retrospective application of the MPPAA is unconstitutional.

To summarize, we find that, on balance, the withdrawal liability provisions of the MPPAA survive scrutiny under the analysis described in this court's decision in *Nachman.* We reach this conclusion with respect to both the clearly retrospective aspects of the statute and to its after-the-fact impact on existing contracts.

## C. Takings Clause

We turn now to appellants' claim that the withdrawal liability provisions of the

---

*infra,* weighed in favor of the constitutionality of the MPPAA. *Republic Industries,* at 639–640.

**31.** The statute contains "de minimis" exemptions, 29 U.S.C. § 1389(a) (Supp. V 1981), reducing the burden of liability on smaller em-

ployers; provisions reducing liability if a withdrawal results from the liquidation or dissolution of an employer's business, *id.* at § 1405; and provisions limiting an employer's liability if installment payments stretch beyond 20 annual payments, *id.* at § 1399(c)(1)(B).

MPPAA also violate the fifth amendment proscription against the taking of private property for public use without just compensation.[32] The district court dispensed with this claim rather cursorily, finding that the "MPPAA does not ... deprive employees of any rights in *specific* tangible property" and hence that the takings clause was inapplicable. *Peick,* 539 F.Supp. at 1040 n. 30 (emphasis in original). While we reach a conclusion similar to that of the district court (and also the Fourth Circuit in *Republic Industries*), we think that the Supreme Court's recent opinion in *United States v. Security Industrial Bank,* 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982), necessitates a closer look at the claim.

■ Traditionally, it has been understood that in order to make a claim under the takings clause, the claimant must prove that "property," in the sense of "the group of rights inhering in the citizen's relation to [a] physical thing," has been "taken." *United States v. General Motors Corp.,* 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945). There has been no "set formula" which the Supreme Court has evolved to determine when " 'justice and fairness' require that economic injuries caused by public action be compensated by the government.... Rather, [the Court] has examined the 'taking' question by engaging in essentially ad hoc, factual inquiries that have identified several factors—such as the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action—that have particular significance." *Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979), *quoting Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). Before reaching the issue whether there has been a "taking," however, we must consider, as a threshold matter, whether the contractual right which employers purportedly enjoy in being insu-

lated from further liability to the pension plans in which they participate is "property" protected under the takings clause.

The appellants argue that "contractual provisions creating investment backed expectations constitute compensable property rights just as much as actual ownership of property." They cite such cases as *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935), and *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), in support of this proposition. But these cases do not support appellants' position. In *Radford,* the Supreme Court held that the Frazier-Lemke Act, June 28, 1934, c. 869, 48 Stat. 1289, which permitted a debtor to buy back mortgaged property at less than fair market value, violated the takings clause. The Court held the statute void because it constituted a "taking of substantive rights in specific property acquired by the [mortgagee] prior to the Act," *Radford,* 295 U.S. at 590, 55 S.Ct. at 863. In *Pennsylvania Coal,* a coal company conveyed surface rights to a parcel of land. A state statute subsequently prohibited mining on the land, precluding the coal company from exercising the right to mine, which it had expressly retained under the deed transferring surface rights. The Court found that the state statute effected a taking of property which constitutionally required compensation. *See also Armstrong v. United States,* 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1961) (governmental foreclosure on uncompleted ships defeated materialmen's liens and constituted fifth amendment "taking").

Appellants' cited cases present situations entirely distinct from the case before us. Appellants ignore the key factor relied upon by the Court in both *Radford* and *Pennsylvania Coal*—the presence of a legally enforceable and recognizable interest in distinct property. Unlike the case before us, *Radford* and *Pennsylvania Coal* involved parties who sought to protect their interests

---

**32.** "... nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

in real property. This dichotomy between "property rights," which are protected by the takings clause, and "contract rights," which are not, was recently reaffirmed by the Supreme Court in the *Security Industrial Bank* case. 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1983).

*Security Industrial Bank* involved the constitutionality of section 552(f)(2) of the Bankruptcy Reform Act of 1978, 11 U.S.C. § 522(f)(2) (1982). Section 522(f)(2) allows individual debtors in bankruptcy proceedings to avoid liens on certain types of personal property. The appellees, who were creditors with perfected, but nonpossessory, liens, claimed that the application of section 522(f)(2) to liens acquired before the enactment date of the Act would violate the takings clause of the fifth amendment. While the Court avoided a decision as to the constitutionality of the Act by construing the statute narrowly, its discussion of the takings clause clearly indicates that the Court continues to view this constitutional provision as offering no protection for "contractual rights" as opposed to "property rights." 103 S.Ct. at 411–12. The Court stated that it thought the "property right of the ... creditor in the collateral" was "quite different in legal contemplation" from the "contractual right of [the same] secured creditor to obtain repayment of his debt." *Id.* at 411. While the Court noted that the " 'bundle of rights' which accrues to a secured party is obviously smaller than that which accrues to an owner in fee simple," it clearly viewed that "bundle" as being sufficiently identified with specific property that it merited the protection of the takings clause even if the simple contractual right of a creditor to be repaid would not. *Id.*

▪ The contractual rights of the employers in the case before us are in no way analogous to the type of rights in specific property protected under the takings clause. Appellants identify no interests other than their purely contract-based "right" to avoid liability for further contributions to the pension plans in which they participate. Because this contractual right in no way constitutes a type of distinct and identifiable "property", we need not even reach the question of whether there was a "taking" in this case. We therefore approve the district court's finding that the takings clause is inapplicable to the case before us and that legislative infringement of purely contractual rights is properly scrutinized under the due process clause.

## IV

Finally, appellants contend that the MPPAA's withdrawal provisions are unconstitutionally vague and that the MPPAA's requirement of mandatory arbitration of disputes over withdrawal liability violates the constitutional right of freedom of contract, right of access to the courts and right to jury trial. The district court found little merit in these contentions and we agree. With respect to the vagueness argument, appellants select five terms from the entire statute: the "trucking industry exception," 29 U.S.C. § 1383(d) (Supp. V 1981); the provision exempting a withdrawal caused by a sale of assets to an unrelated party, *id.* § 1384; and the "de minimis" exception, *id.* § 1389. They then argue that, because these particular terms are allegedly vague and difficult to apply, the withdrawal provisions in general are unconstitutionally vague.

▪ In this connection, *Village of Hoffman Estates v. Flipside,* 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982), establishes a very heavy burden for a party seeking to have a federal regulatory statute declared void for vagueness in a facial challenge. In a facial challenge, "the complainant must demonstrate that the law is impermissibly vague in all of its applications." 455 U.S. at 497, 102 S.Ct. at 1192. Appellants have not even attempted to make such a showing. Indeed, it may well be impossible for such a showing to be made in the present posture of this case. There has, as yet, been no attempt to apply the contested language in either arbitration proceedings, as provided for in the Act, or in the district court. The disputed language is not so ambiguous or unintelligible that we may

say now that it is "impermissibly vague in all of its applications." We therefore reject the appellants' claim that the MPPAA's withdrawal liability provisions are impermissibly vague on their face. *Accord, Republic Industries,* at 643.

We may also quickly dispense with appellants' rather briefly stated claim that the mandatory arbitration provisions of the MPPAA infringe on constitutional rights such as "liberty of contract," "access to the courts," and "the right to a jury trial." There is clearly no abridgment of appellants' right of "access to the courts" since the statute itself expressly provides for judicial review of any arbitration award. 29 U.S.C. § 1401(b)(2) (Supp. V 1981). Appellants do not specify in what manner they find mandatory arbitration provisions to restrict their freedom to contract. They cite *Dorchy v. Kansas,* 264 U.S. 286, 44 S.Ct. 323, 68 L.Ed. 686 (1924), and *Charles Wolff Packing Co. v. Kansas,* 262 U.S. 522, 43 S.Ct. 630, 67 L.Ed. 1103 (1923), in support of their claim, but these cases are inapposite. Both *Dorchy* and *Wolff* involved a Kansas statute which created a system of compulsory arbitration for labor disputes. The arbitration tribunal created by the statute had wide-ranging power to settle *private* disputes by imposing "compulsory settlements." *Wolff,* 262 U.S. at 540–44, 43 S.Ct. at 634–36. The compulsory arbitration process of the MPPAA is in no way analogous to this. Under the MPPAA, arbitration is used as a means of encouraging parties to attempt to reach settlement with respect to obligations created by the Act itself. Arbitration is thus merely the first step in resolving conflicts arising from the Act. We do not think that this process in any way restricts the parties' freedom to enter private contractual relationships.

We also reject appellants' seventh amendment-based claim. The Supreme Court's recent opinion in *Atlas Roofing Co. v. Occupational Safety and Health Review Commission,* 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977), clearly sanctions the use of mandatory arbitration under a statute like the MPPAA. The Court expressly found that Congress may assign to a nonjudicial forum the authority to initially adjudicate claims derived from "statutory public rights" which it has created. Despite appellants' contention to the contrary, we agree with the district court that the MPPAA does indeed create "statutory public rights." Liability under the MPPAA is not a contractually or privately created burden, rather it is imposed by law and its benefits eventually inure to all beneficiaries of multiemployer pension plans. We therefore conclude that Congress did not abridge the appellants' rights to a jury trial under the seventh amendment by requiring appellants to arbitrate their dispute before seeking a judicial remedy.

## V

Hence, the withdrawal liability provisions of the MPPAA survive every constitutional scrutiny. And we find that the MPPAA, as it is presented in the context of this case, is neither impermissibly vague nor do its mandatory arbitration provisions infringe upon constitutional rights. We thus AFFIRM the judgment of the district court.

ESCHBACH, Circuit Judge, dissenting.

To establish standing, each of the Employer Associations carried the burden of demonstrating that at least one of its members is "suffering immediate or threatened injury of the sort that would make out a justiciable case had the member ... brought suit." *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975). The 705 Fund carried the burden of establishing its own personal injury. Because I believe that the record fails to reveal any injury sufficient to satisfy the case or controversy requirement of Article III, I would vacate the order granting summary judgment and instruct the district court to dismiss the case for want of subject matter jurisdiction.

The majority holds that employers contemplating whether to cease contributing to the 705 Fund may challenge the constitutionality of the MPPAA. Such an employer would naturally want a decision from a

federal court as to the constitutionality of the MPPAA's withdrawal liability provisions. The majority's opinion, therefore, will assist employers in making their plans. In my view, however, what the Employer Associations seek, on behalf of employers still contributing to the 705 Fund, "is pretty close to an advisory opinion in the literal sense." *People of the State of Illinois v. Archer Daniels Midland Co.,* 704 F.2d 935, 941 (7th Cir.1983).

The majority opinion stands for the proposition that an entity contemplating an action that may create a liability is entitled to seek a legal opinion from a federal court as to whether the liability can legally accrue. In light of the majority's decision, a business organization is seemingly entitled to have a federal court determine the antitrust implications of a future joint venture. Moreover, a firm considering a revision in its employment criteria apparently may seek a federal judge's opinion as to whether the proposed criteria comply with the federal civil rights laws. We all live and work in a world laden with legal uncertainties and there may be value in courts rendering advice. Whatever the advantages, however, I would prefer to abide by the Constitution's proscription against the federal courts issuing advisory opinions.

The record does reveal that four members of the Employer Associations have ceased contributing to the 705 Fund. These employers thus do not need a constitutional ruling to assist them in making a decision whether to withdraw from the multiemployer fund. Without taking further actions, they may be amenable to proceedings to enforce the withdrawal liability provisions of the MPPAA. Contrary to the majority's holding, however, the possibility or "threat" of proceedings to collect a withdrawal liability does not constitute an injury sufficient to confer standing.

For this declaratory judgment action to "present a justiciable controversy the threat of enforcement must have immediate coercive consequences of some sort upon" the four employers no longer contributing to the 705 Fund. *Nuclear Engineering Co. v. Scott,* 660 F.2d 241, 252 (7th Cir.1981), *cert. denied,* 455 U.S. 993, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982). The record must demonstrate that the possibility of owing a withdrawal liability is inhibiting or injuring the employers' businesses *today,* not at some hypothetical future date. *See People of the State of Illinois v. Archer Daniels Midland Co.,* 704 F.2d 935, 942–43 (7th Cir. 1983). From my reading of the record, I can discover no basis for concluding that the four employers are suffering a present-day injury merely from the existence of the MPPAA and its withdrawal liability provisions.

We know from the record that an employer must disclose on its financial statement its potential withdrawal liability if that figure is "significant" or "material." We further know that a disclosed contingent liability might affect a financial institution's decision to extend credit. That is the extent of the showing that the four employers are suffering a present-day injury as a result of the MPPAA. In light of what we do not know, I find this showing woefully inadequate.

There are good reasons, in fact, to believe that the four employers are not facing a *significant* contingent liability injuring their businesses. At no point have the employers waived their statutory defenses to any attempt to collect withdrawal liabilities. *See, e.g.,* 29 U.S.C. §§ 1383(a), 1461(e)(2)(A) (obligation to contribute ceased prior to MPPAA's effective date); *id.* § 1398 (contributions ceased because of change in corporate structure or labor dispute); *id.* § 1384 (sale-of-assets exemption). Indeed, because the MPPAA states that an employer shall be notified of the amount of liability "as soon as practicable" after it withdraws, *id.* § 1399(b)(1), there is doubt whether the four employers, which have not been so notified, may be held liable under the statute. Furthermore, as the district court noted, owing to the "de minimis" exemption in the MPPAA, "seventy percent of the firms contributing to the Local 705 Fund could withdraw without incurring any liability whatsoever." 539 F.Supp. at 1050.

Finally, the significance of a contingent withdrawal liability is further reduced by the fact that the 705 Fund is not interested in collecting any withdrawal liability.

In addition to the Employer Associations' inadequate showing that the employers no longer contributing to the 705 Fund face a significant contingent liability, the record is silent about the current status of these firms. We do not even know if the four employers are currently operating entities. If they are not, it seems unlikely that they are seeking credit and finding the search impaired by the MPPAA. If one of the four actually is seeking credit and finding funds unavailable or more costly because of the MPPAA, an affidavit describing the situation could have been submitted. None was filed and thus the Employer Associations failed to establish an injury that is "real, not imaginary; concrete, not abstract; apparent, not illusory; and demonstrable, not speculative." *Myron v. Chicoine*, 678 F.2d 727, 730 (7th Cir.1982); *see City of Los Angeles v. Lyons*, —— U.S. ——, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983); *J.N.S., Inc. v. Indiana*, 712 F.2d 303, 305 (7th Cir.1983).

The 705 Fund (and its Trustees) similarly failed to establish that the fund is suffering an immediate, concrete injury.[1] Affidavits submitted by a trustee and the fund's actuary state that, in their opinions, the MPPAA will discourage newly organized employers from commencing contributions to the 705 Fund and will encourage established employers to reduce the number of workers for which they make contributions. The affiants opine that, at some future time, the 705 Fund's viability might be jeopardized.

I do not view these affidavits as a sufficient showing of an immediate, nonspeculative injury. The affidavits do not assert that the 705 Fund's financial status has been injured to date. On the contrary, the actuary's own affidavit reveals that because of the MPPAA the 705 Fund may collect millions of dollars from withdrawing employers. It is incredible to believe, particularly in light of the majority's extensive discussion of the rationality of the MPPAA, that the 705 Fund is suffering an immediate fiscal injury. Incredulity aside, it is clear that the 705 Fund has not established a concrete, immediate, and nonspeculative injury. At some point the harm that the affiants predict might occur, and then the 705 Fund would have standing to bring a declaratory judgment action. *See J.N.S., Inc. v. Indiana*, 712 F.2d 303, 305 (7th Cir. 1983). Until such a time, the 705 Fund's "injury" consists of what the majority terms a "concern" about the MPPAA's constitutionality; a concern, however, is not the type of injury that supports an action in federal court. *See Vander Jagt v. O'Neill*, 699 F.2d 1166, 1177–78 (D.C.Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983); *D'Amico v. Schweiker*, 698 F.2d 903 (7th Cir.1983); *Myron v. Chicoine*, 678 F.2d 727, 730 (7th Cir.1982).

---

1. There is no indication that the day-to-day investment and managerial operations of the fund are adversely affected by the existence of the MPPAA.