KEITH FULTON & SONS, INC.,
Plaintiff, Appellant,

v.

NEW ENGLAND TEAMSTERS AND
TRUCKING INDUSTRY PENSION
FUND, et al., Defendants, Appellees.

No. 83–1804.

United States Court of Appeals,
First Circuit.

Argued Jan. 4, 1984.

Decided Aug. 6, 1984.

Anthony M. Feeherry, Boston, Mass., with whom Joseph L. Cotter, Susan K. Hoffman, and Goodwin, Procter & Hoar, Boston, Mass., were on brief, for plaintiff, appellant.

James T. Grady, Boston, Mass., with whom Gabriel O. Dumont, Jr., and Grady, Dumont & Dwyer, Boston, Mass., were on brief, for defendants, appellees.

J. Stephen Caflisch, Sp. Counsel, Washington, D.C., with whom Henry Rose, Gen. Counsel, Baruch A. Fellner, Associate Gen. Counsel, Peter H. Gould, Terence G. Craig, and David F. Power, Attys., Washington, D.C., were on brief, for Pension Benefit Guaranty Corp., amicus curiae.

Before CAMPBELL, Chief Judge, ALDRICH, Circuit Judge, and PETTINE,* Senior District Judge.

PETTINE, Senior District Judge.

In this case plaintiff/appellant Keith Fulton & Sons, Inc., is challenging the constitutionality of certain provisions of the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA) as applied to it. The MPPAA amended various provisions of the Employee Retirement Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.* The district court below granted summary judgment on all counts in favor of the defendants. We affirm in part and reverse in part.

## I. BACKGROUND

The MPPAA was enacted in 1980 to cure certain perceived problems in ERISA as it applied to multiemployer pension plans. Under ERISA, the Pension Benefit Guaranty Corporation (PBGC), a government corporation, protects employees covered by pension plans by insuring their benefits against the fund failing or terminating with insufficient funds. The PBGC's program is funded by premiums collected from pension funds. 29 U.S.C. § 1307. Under ERISA as it was originally enacted, an employer who withdrew from a plan incurred a contingent liability. If a pension plan terminated, all the employers of that plan who had contributed to it at any time

* Of the District of Rhode Island, sitting by designation.

within the five years preceding its termination were collectively liable to the PBGC for the amounts the PBGC expended.

Each individual employer's liability could not exceed 30% of its net worth. If the fund did not terminate within the five years after the employer ceased contributing, that employer had no further liability.

Congress directed the PBGC to prepare a report on the impact of the insurance program on multiemployer plans and their impact on the program itself. The PBGC reported that ERISA's contingent liability provisions gave employers an incentive to withdraw from multiemployer plans to avoid liability if the plan terminated in the future. Moreover, the PBGC told Congress that about 2% of the multiemployer plans, covering about 5% of all the participants in multiemployer plans, were in danger of terminating within five years and that 10% of the plans, covering about 15% of all the participants in multiemployer plans, might terminate within ten years. The PBGC concluded that the premiums paid to it were insufficient to cover its expected liabilities under the scheme.

Congress responded by enacting the MPPAA in 1980. The MPPAA sought to discourage voluntary withdrawals from multiemployer plans, and to reduce the possible liability of the PBGC, by imposing a mandatory liability on all withdrawing employers. This liability is a portion of the plan's unfunded vested liability (which is the difference between the present value of the fund's vested benefits and the value of its assets). The MPPAA was signed into law on September 26, 1980; however, a retroactive provision imposed the MPPAA's withdrawal liability on any employer which ceased contributing to a multiemployer pension plan on or after April 29, 1980.

## II. FACTS

Keith Fulton & Sons, Inc. (Fulton) was a heavy equipment hauler and railroad car unloader located in Cambridge, Massachusetts. On November 10, 1980, the City of Cambridge acquired Fulton's land in a federally subsidized taking for a public transportation project. After looking for a new location, Mr. Keith Fulton, the corporation's sole stockholder, decided to cease all of Fulton's business operations on December 31, 1980. Mr. Fulton has consistently alleged that his business was profitable and that its cessation was involuntary.

For many years, Fulton had entered into collective bargaining agreements with Teamster Local 379. As a part of these contracts, Fulton was a contributor to the New England Teamsters and Trucking Industry Pension Fund (the Fund), a multiemployer pension plan. At the time that Fulton last renewed its contract with the Teamsters, the Fund's Trust Agreement stated that "[t]he financial liability of any Employer shall in no event exceed the obligation to make contributions as set forth in its applicable collective bargaining agreement with the Union or Unions." Agreement and Declaration of Trust, art. VI, § 7, quoted in Stipulation of Undisputed Facts at 3, App. at 594.

Since Fulton withdrew from the Fund after April 29, 1980, the effective date of MPPAA withdrawal liability, the Fund sent Fulton a letter on September 1, 1981, which demanded that Fulton pay a withdrawal liability of $468,637. This demand was based on the MPPAA which was signed into law three months before Fulton closed its business and a month and a half before Fulton's land was taken. The $468,637 was payable in 61 "easy" monthly installments of $9,508 and a final installment of $1,298, for a total including interest of $581,286.

Fulton filed this suit on October 28, 1981. Judge Skinner granted the Fund's motion for summary judgment on August 3, 1983. This appeal followed.

## III. SUBSTANTIVE DUE PROCESS

Fulton's primary claim is that the application of the MPPAA's withdrawal liability to it violates its substantive due process rights. Fulton bases this argument on two distinct lines of reasoning. First, Fulton urges us to invalidate this application of

the MPPAA under a contract clause-type of due process analysis discussed by the Seventh Circuit in *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 592 F.2d 947 (7th Cir.1979), *aff'd* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980) (affirmed by Supreme Court on statutory grounds only). Second, Fulton urges that this application of the Act also does not pass constitutional muster under the more traditional standard of due process review found in *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976).

■ The contract clause applies only to state legislation. However, in *Nachman,* the plaintiff contended that fifth amendment due process and the contract clause had similar reaches. Noting that "several authorities have suggested that the analysis employed in Contract Clause cases is also relevant to judicial scrutiny of Congressional enactments under the Due Process Clause," and that "[b]oth employ a means-end rationality test," the Seventh Circuit analyzed Nachman's due process claim under contract clause cases. The court explicitly did not decide that the heightened scrutiny of the contract clause was appropriate for due process analysis; it stated that "since we are convinced that ERISA withstands the scrutiny employed under the Contract Clause cases, we need not decide whether the two clauses in fact impose identical restraints on legislative impairment of contracts." *Nachman,* 592 F.2d at 959. *See Peick v. Pension Benefit Guaranty Corp.*, 724 F.2d 1247, 1263, 1264 n. 22 (7th Cir.1983). Fulton's brief contends that this court adopted *Nachman*'s analysis in *Pension Benefit Guaranty Corp. v. Ouimet Corp.*, 630 F.2d 4, 12 (1st Cir.1980), *cert. denied* 450 U.S. 914, 101 S.Ct. 1356, 67 L.Ed.2d 339 (1981).

In the *Ouimet* case, this court did not adopt the analysis used in *Nachman.* Indeed, on the page of *Ouimet* which Fulton cites, this court refused to accept Ouimet Corporation's contention that its due process challenge to ERISA should be analyzed under contract clause cases. *Ouimet,* 630 F.2d at 12 (rejecting the contract

clause analysis of *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978) and the *Lochner* era due process analysis of *Railroad Retirement Board v. Alton Railroad Co.,* 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935), in favor of *Turner Elkhorn* ).

Since oral argument in this case, the Supreme Court has unanimously rejected the use of contract clause-type analysis in due process challenges to federal legislation. *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, —— U.S. ——, ——, 104 S.Ct. 2709, 2718, 81 L.Ed.2d 601 (1984). After noting that the contract clause applies only to the states and that the Constitutional Convention rejected a similar restraint on the federal government, *id.* at —— n. 9, 104 S.Ct. at 2719 n. 9 (citing 5 Elliot's Debates 546 (2nd ed. 1876); 2 The Records of the Federal Convention of 1787, at 619 (M. Farrand 1911)), the Court stated:

We have never held, however, that the principles embodied in the Fifth Amendment's Due Process Clause are coextensive with prohibitions existing against state impairments of pre-existing contracts. See, *e.g., Philadelphia, Baltimore & Washington Railroad v. Schubert,* 224 U.S. 603 [32 S.Ct. 589, 56 L.Ed. 911] (1912). Indeed, to the extent that recent decisions of the Court have addressed the issue, we have contrasted the limitations imposed on States by the Contract Clause with the less searching standards imposed on economic legislation by the Due Process Clauses. See *United States Trust Co. v. New Jersey,* 431 U.S. 1, 17, n. 13 [97 S.Ct. 1505, 1515, n. 13, 52 L.Ed.2d 92] (1977). And, although we have noted that retrospective civil legislation may offend due process if it is "particularly 'harsh and oppressive,'" *ibid.* (quoting *Welch v. Henry,* 305 U.S. 134, 147 [59 S.Ct. 121, 126, 83 L.Ed. 87] (1938), and citing *Turner Elkhorn, supra* [428 U.S.,] at 14–20 [96 S.Ct., at 2891–95]), that standard does not differ from the prohibition against arbitrary and irrational legislation that we clearly

enunciated in *Turner Elkhorn.* —— U.S. at ——, 104 S.Ct. at 2720.

Applying the *Turner Elkhorn* standard in *R.A. Gray,* the Court found that the retroactive provisions of the MPPAA were constitutional. This court declined to accept the contract clause approach in *Ouimet, supra,* and we reject it again today. We therefore turn to the more traditional due process standard of *Turner Elkhorn.*

In *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), the Supreme Court considered a substantive due process challenge to Title IV of the Federal Coal Mine Health and Safety Act of 1969, 83 Stat. 792, as amended by the Black Lung Benefits Act of 1972, 86 Stat. 150, codified at 30 U.S.C. § 901 *et seq.* The legislation in that case imposed retroactive liability upon coal mine operators for black lung disease suffered by former employees. The Supreme Court applied the lower level of due process scrutiny which has prevailed in challenges to legislation since the end of the *Lochner* era:

> It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way. See, *e.g., Ferguson v. Skrupa,* 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 487–488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955). And this Court long ago upheld against due process attack the competence of Congress to allocate the interlocking economic rights and duties of employers and employees upon workmen's compensation principles analogous to those enacted here, regardless of contravening arrangements between employer and employee. *New York Central R. Co. v. White,* 243 U.S. 188, 37 S.Ct. 247, 61 L.Ed. 667 (1917); see also *Philadelphia, B. & W.R. Co. v. Schubert,* 224 U.S. 603, 32 S.Ct. 589, 56 L.Ed. 911 (1912).
>
> . . . . .
>
> [O]ur cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. This is true even though the effect of the legislation is to impose a new duty or liability based on past acts.

*Turner Elkhorn,* 428 U.S. at 15–16, 96 S.Ct. at 2892–93 (some citations omitted).

The Court found the scheme to be constitutional because "the imposition of liability for the effects of disabilities bred in the past is justified as a rational measure to spread the costs of employees' disabilities to those who have profited from the fruits of their labor—the operators and the coal consumers." *Id.* at 18, 96 S.Ct. at 2893.

Under the due process analysis employed in *Turner Elkhorn,* the MPPAA's imposition of withdrawal liability on Fulton is constitutional. *Washington Star Co. v. International Typographical Union Negotiated Pension Plan,* 729 F.2d 1502, 1510–11 (D.C.Cir.1984); *Peick, supra,* 724 F.2d at 1266–68. Congress and the PBGC studied the problems of multiemployer plans extensively. In 1980, there were about 2000 multiemployer plans covering approximately 8,000,000 employees and retirees. H.R.Rep. No. 869, Part I, 96th Cong., 2d Sess. 52–53, *reprinted in* 1980 U.S.Code Cong. & Ad.News 2918, 2920–21. The House Committee on Education and Labor stated that "some [multiemployer] plans in certain industries or geographic areas are experiencing or are likely to experience serious financial difficulties." *Id.* at 51, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 2919. Moreover, the House Committee concluded "that existing law, and particularly the provisions governing plan termination insurance, do nothing to strengthen financially weak plans, and in some cases may actually cause further deterioration of a plan's financial condition and create incentives to terminate a plan in financial difficulty." *Id.* The purpose of the withdrawal liability provisions was "to

protect the funding base of the plan so that remaining employers will not be forced to absorb additional cost increases. In the absence of these rules, the committee believes that employer withdrawals will lead to plan failures with unnecessary losses for participants and the PBGC." *Id.* at 73, *reprinted in* 1980 U.S.Code Cong. & Ad. News at 2941.

Similarly, the House Ways and Means Committee noted that before ERISA,

multiemployer plans in financial distress sometimes delayed funding, reduced benefits, or imposed further restrictions on eligibility for benefits. The ERISA standards designed to require systematic plan funding, and to protect employee benefits have, accordingly reduced the ability of multiemployer plans to deal with financial distress. The PBGC has indicated that the combined effect of the availability of guaranteed benefits, limited employer liability on termination, and ERISA restrictions on the ability of a plan to reduce its liabilities has made termination attractive for multiemployer plans covering workers in declining industries. According to the PBGC, in a significant number of cases, plan termination will be less expensive for employers maintaining a particular multiemployer plan than continuation of the plan. H.R.Rep. No. 869, Part II, 96th Cong., 2d Sess. 10, *reprinted in* 1980 U.S.Code Cong. & Ad.News 2992, 3001.

The imposition of liability on every withdrawal was a logical, and equitable, way to approach this problem: "The non-imposition of any single employer's withdrawal liability might be the straw that broke the camel's back—if the plan foundered. Who is to say which brick of the thousands forming the edifice of a stable pension plan is without importance, or not to be relied upon?" *Peick, supra,* 724 F.2d at 1272–73.

At oral argument, Fulton stressed its view that the scheme did not survive the minimal scrutiny test because of an insufficient nexus between the harm Congress sought to alleviate and the means chosen to accomplish the goal. A review of the legislative history, however, refutes this contention.

"The primary purpose of the [MPPAA]," according to the House Committee on Education and Labor, "is to protect retirees and workers who are participants in [multiemployer] plans against the loss of their pensions." H.R.Rep. No. 869, Part I, *supra,* at 51, reprinted in 1980 U.S.Code Cong. & Ad.News at 2919. Congress was concerned that *any* employer withdrawals from those plans affected their future health:

The capacity of a multiemployer plan to meet its benefit commitments depends on the maintenance of a stable or growing contribution base. Discrete instances of withdrawal will not affect the soundness of a plan if the withdrawn employer is replaced by newly entering contributors or expansion of covered employment with other contributing employers. If employer withdrawals are accompanied by a decline in the industry, trade, or craft covered by the plan, however, the resulting funding burden on remaining contributors and active employees may be intolerably high. In highly competitive or marginal industries, such increased costs may make the plan unattractive so that new employers are discouraged from coming into the plan. The solvency of the plan is then threatened, particularly where benefit improvements have been funded over unrealistically long periods of time.

*Id.* at 53–54, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 2921–22.

As Congress stated in the bill, it found that

(A) withdrawals of contributing employers from a multiemployer pension plan frequently result in substantially increased funding obligations for employers who continue to contribute to the plan, adversely affecting the plan, its participants and beneficiaries, and labor-management relations, and

(B) in a declining industry, the incidence of employer withdrawals is higher and the adverse effects described in subparagraph (A) are exacerbated.

29 U.S.C. § 1001a(a)(4).

Congress therefore chose withdrawal liability as a means to both deter withdrawals and to make the employer liable for any damage caused by the withdrawal. We cannot say that Congress' scheme was arbitrary or irrational.

■ Fulton also argues the method Congress chose for imposing withdrawal liability is invalid because the amount assessed is not rationally connected to the actual cost of funding the pension benefits. This part of Fulton's argument is ultimately based on *Turner Elkhorn*'s analysis of *Railroad Retirement Board v. Alton Railroad Co.*, 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935). *See Turner Elkhorn*, 428 U.S. at 19, 96 S.Ct. at 2894. In *Turner Elkhorn*, the Court cast doubt on the continued vitality of *Alton*'s due process analysis; however, since the Court found that the black lung compensation law would survive *Alton*, it did not definitively resolve *Alton*'s vitality. *Id.* More recently, in the *R.A. Gray* case, the Court again cast doubt on *Alton*'s viability by stating that Gray urged it to "resuscitate" *Alton*. *R.A. Gray, supra*, — U.S. at —, 104 S.Ct. at 2718. The Court avoided tolling *Alton*'s death knell by distinguishing the case. *See id.*

This court did not follow *Alton* in *Ouimet, supra*, 630 F.2d at 12. A reading of Alton demonstrates that its harsh review of the wisdom of economic legislation belongs to the *Lochner* era, not the present one. *See Alton, supra; Peick, supra*, 724 F.2d at 1266. In addition, this case is factually distinguishable from *Alton* on the same ground the Supreme Court distinguished *Alton* from *R.A. Gray:*

> Unlike the statute in *Alton*, which created pensions for employees who had been fully compensated while working for the railroads, the MPPAA merely requires a withdrawing employer to compensate a pension plan for benefits that have already vested with the employees at the time of the employer's withdrawal. *R.A. Gray*, — U.S. at —, 104 S.Ct. at 2720.

In effect, Congress has simply readjusted the terms of Fulton's preexisting contract to pay pension benefits—a far cry from the broad creation of a new retirement benefit at issue in *Alton*. We therefore decline to apply *Alton*.

When we apply the minimal scrutiny standard to the method Congress chose to determine withdrawal liability, we find it to be constitutional. The withdrawal liability is determined in relation to the employer's past contributions and the present unfunded vested benefits of the fund and is therefore rationally related to the harm caused the fund by a withdrawal. In addition, the fact that Fulton had no direct control over fund management does not render the imposition of withdrawal liability based partially on the fund's current shortfall illogical. The fund is in the hands of eight trustees, half of whom represent other employers, and all of whom have a fiduciary duty to the fund. As it would violate their duty to mismanage the fund, we will not assume that they do.

Finally, Fulton has throughout these proceedings characterized itself as a profitable operation put out of business involuntarily by a federally-subsidized taking of its land. This does not change the status of Fulton's challenge. The MPPAA and its legislative history show that Congress was concerned about the effect of *any* withdrawal, not just "voluntary" ones. Any withdrawal causes the same harm to the fund—it was logical for Congress to not distinguish between them on the basis of voluntariness. Indeed, although the court did not address the issue, the employer withdrawal in the *Washington Star* case was no more "voluntary" than the instant one. *See Washington Star, supra*, 729 F.2d at 1506.

## IV. SEVENTH AMENDMENT

■ The MPPAA requires entities challenging assessments of withdrawal liability to do so in an arbitration proceeding. Although district court review of the arbitrator's decision is available, a de novo trial with a jury is not. Fulton alleges that this

procedure violates its seventh amendment rights.[1]

In *Parsons v. Bedford,* 28 U.S. (3 Peters) 433, 7 L.Ed. 732 (1830), the Supreme Court held that the seventh amendment preserved the right to a jury trial in all cases "in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized...." *Id.* at 447, 7 L.Ed. at 737. Later cases, though, limited *Parsons'* broad language and found that Congress could entrust statutory rights and remedies of an otherwise legal character to other sorts of tribunals when the proceedings are "not in the nature of a suit at common law." *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 48, 57 S.Ct. 615, 629, 81 L.Ed. 893 (1937). In *Atlas Roofing Co. v. Occupational Safety and Health Review Commission,* 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977), the Court stated that,

> the Seventh Amendment was never intended to establish the jury as the exclusive mechanism for factfinding in civil cases. It took the existing legal order as it found it, and there is little or no basis for concluding that the Amendment should now be interpreted to provide an impenetrable barrier to administrative factfinding under otherwise valid federal regulatory statutes. *We cannot conclude that the Amendment rendered Congress powerless—when it concluded that remedies available in courts of law were inadequate to cope with a problem within Congress' power to regulate—to create new public rights and remedies by statute and commit their enforcement, if it chose, to a tribunal other than a court of law*—such as an administrative agency—*in which facts are not found by juries.*

*Id.* at 460, 97 S.Ct. at 1271 (emphasis added).

Although *Atlas* appears to dispose of Fulton's argument, Fulton would have us distinguish it because it involved an administrative proceeding, rather than private arbitration, and because Fulton argues that private rights, rather than public rights, are at stake here. We reject both arguments. When the Supreme Court wrote that Congress may commit the enforcement of new public rights "to a tribunal other than a court of law—*such as* an administrative agency." it implied that other sorts of tribunals would also be appropriate. *Atlas,* 430 U.S. at 460, 97 S.Ct. at 1271 (emphasis added). We fail to see how an impartial arbitrator would jeopardize Fulton's seventh amendment rights any more than an administrative tribunal.

In addition, we find that this case does involve "public rights." *See Atlas,* 430 U.S. at 450 n. 7, 97 S.Ct. at 1266 n. 7. The MPPAA was enacted to protect the pension rights of millions of Americans. It constitutes a pervasive scheme by which multiemployer pension plans are regulated. The imposition of withdrawal liability is certainly as much a public right as the regulation of workplace safety in *Atlas,* labor-management relations in *Jones & Laughlin,* or landlord-tenant relations in *Block v. Hirsh,* 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865 (1921).

Finally, although this discussion has assumed that the determination of withdrawal liability is a proceeding of a "legal" nature, the proper classification of the rights at issue may well be "equitable." The pension fund is a trust; proceedings involving the administration of trusts have traditionally been considered "equitable." Thus, even under *Parsons,* there may be no right to a jury trial here.

## V. RIGHT OF ACCESS TO THE COURTS

 Fulton asserts that its fifth amendment right of access to the courts is violat-

---

1. The seventh amendment provides that
 In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

ed by the compulsory arbitration provisions of the MPPAA. However, the MPPAA does not disallow Fulton challenging the withdrawal liability in the courts—this being a compulsory but appealable proceeding, it merely requires Fulton to go through arbitration first. In this way, the arbitration provisions are similar to the familiar doctrine of exhaustion of administrative remedies. Since Fulton may go to court after arbitration, albeit with a presumption of correctness in the arbitrator's findings of fact, we fail to see how Fulton's right of access to the courts has been abridged.

## VI. PROCEDURAL DUE PROCESS AND THE PRESUMPTION OF CORRECTNESS GIVEN THE CALCULATION OF WITHDRAWAL LIABILITY BY THE FUND

Fulton argues that the MPPAA's requirement that the Fund's calculation of the amount of withdrawal liability be presumed correct by the arbitrator deprives it of procedural due process. Fulton contends that this is caused by a combination of the lack of precision in the actuarial art and the fact that the trustees have a fiduciary duty to the fund which may lead them to collect as much as possible from withdrawing employers. We agree and therefore find that 29 U.S.C. §§ 1401(a)(3)(A) and 1401(a)(3)(B) violate the fifth amendment's guarantee of procedural due process.

29 U.S.C. §§ 1401(a)(3)(A) & (B) set the standards of proof for determining the amount of the withdrawal liability in the arbitration proceeding. Subsection (A) provides that, for the purposes of any arbitration proceeding under the MPPAA, "any determination made by a plan sponsor under sections 1381 through 1399 of this title and section 1405 of this title [ (all of which relate to calculating withdrawal liability) ] is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was *unreasonable or clearly erroneous.*" 29 U.S.C. § 1401(a)(3)(A) (emphasis added). Subsection (B) relates to determinations by the trustees of one of the key variables in the withdrawal liability formulas—the amount of a plan's unfunded vested benefits for a particular year:

> In the case of the determination of a plan's unfunded vested benefits for a plan year, the determination is presumed correct unless a party contesting the determination shows by a preponderance of evidence that—
>
> (i) the actuarial assumptions and methods used in the determination were, *in the aggregate, unreasonable* (taking into account the experience of the plan and reasonable expectations), or
>
> (ii) the plan's actuary made a *significant error* in applying the actuarial assumptions or methods.

29 U.S.C. § 1401(a)(3)(B) (emphasis added).

After arbitration, a district court reviewing the arbitrator's award must presume the arbitrator's findings of fact to be correct unless they are rebutted by "a clear preponderance of the evidence." 29 U.S.C. § 1401(c).

We begin our analysis by noting that this evidentiary burden in the MPPAA is rather unique. In a normal civil suit, the burden is on the plaintiff, the one who wants to change the status quo by taking something from the defendant, to prove his entitlement to it in every way by a preponderance of the evidence. In a criminal suit, the government must prove beyond a reasonable doubt its entitlement to change the status quo by taking away a man's liberty. In *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the Supreme Court held that a state could not change the status quo by permanently depriving a parent of the company of a child unless it proved permanent neglect through clear and convincing evidence.

In all of these situations, the applicable burden of proof requires the party who desires to change the status quo to prove his right to do so by showing a more than 50% right to what is at stake; the status quo is not presumed to be changed merely

by the prosecuting party asking for it to be. Moreover, the law applies the same standard of proof to determine not only the existence of liability, but also the extent of that liability. Society is just as concerned that the government prove beyond a reasonable doubt whether a man is guilty of first degree murder, second degree murder or manslaughter. Similarly, in a civil trial, the plaintiff not only must prove that the defendant is liable to him for some reason, but the plaintiff must also prove by a preponderance of the evidence the amount of money or the remedy to which he is entitled.

Under MPPAA, a fund notifies an employer that it believes has withdrawal liability to it. If the employer disagrees that it has any liability, the parties go to arbitration where each is given an even chance to prove its case. Once liability is proven though, the MPPAA does not give the parties an even chance to prove the extent of that liability. The Act's presumption in favor of the fund's calculation of the amount of liability makes that calculation almost unchallengeable. Moreover, after the arbitrator endorses the fund's determination, his decision can only be overturned by a court if a "clear preponderance of the evidence" shows that he incorrectly applied the "clearly erroneous" standard he was required to use. This last, which would be proper in itself had the arbitration proceeding not started with a presumption in favor of what the fund has chosen as an appropriate figure, solidifies the heavy burden placed upon the employer.

In effect, the statute allows the fund to pick any amount out of the range of possibilities which are not clearly erroneous. For an employer such as Fulton, the inexactitude of the actuarial "science" creates a range of possible liabilities which, although not clearly erroneous, may differ by several tens of thousands of dollars. Once an amount is shown to be within this range, the employer has little ability to successfully challenge it.

Moreover, placing this power in the hands of the trustees evokes due process concerns similar to those in *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972). In *Ward*, the town mayor would act as the initial judge for certain minor violations. Although a litigant was allowed a de novo trial in a higher court on review, the Supreme Court struck down the procedure because the mayor had an obvious interest in increasing town revenues and the "[p]etitioner [was] entitled to a neutral and detached judge in the first instance." *Id.* at 60–62, 93 S.Ct. at 83–84 (footnote omitted). Although the presumption of correctness is not enough to change the fund trustees into judges, the heavy presumption combined with the fact that they are not neutral does evoke similar due process concerns. This lack of neutrality by the fund trustees comes from their fiduciary duties to the fund. Consistently picking the highest possible figure for withdrawal liability would best fulfill their fiduciary duties to the fund and the covered employees, besides fulfilling any fiduciary duties which may or may not exist vis-a-vis non-withdrawing employers. In contrast, the trustees have no fiduciary duty toward a withdrawing employer. His withdrawal threatens the stability of the fund. Withdrawal liability, however, gives the trustees not only a chance to punish the withdrawing employer but also a chance to deter further withdrawals through the imposition of the highest possible liability.

■ Congress stated its purpose in including the presumptions as follows:

[these standards of proof] are necessary in order to ensure the enforceability of employer liability. In the absence of these presumptions, employers could effectively nullify their obligation by refusing to pay and forcing the plan sponsor to prove every element involved in making an actuarial determination. The committee believes it is extremely important that a withdrawn employer begin making the annual payments even though the period of years for which payments must continue will be based on the actual liability allocated to the employer.

H.R.Rep. No. 869, Part I, *supra,* at 86, *reprinted in* 1980 U.S.Code Cong. & Ad. News at 2954.

We agree that Congress could rationally require the employer to begin making payments based on the fund's estimate pending arbitration and, after arbitration, based on the arbitrator's findings, until the matter is settled in court. *See infra.* However, we do not feel that giving the fund this great amount of power to control the final outcome of the litigation is justified "in order to ensure the enforceability of employer liability." The arbitration proceeding will provide a forum for the expeditious and economical resolution of disputes over withdrawal liability. The arbitrator's decision will still be entitled to the Act's presumption of correctness unless disproved by a clear preponderance of the evidence.

Of course, the arbitration will be more expensive than the procedure presently mandated by the Act. Fair procedures are rarely as economical as summary ones. However, society's interest in fundamental fairness is greater than its interest in reducing the legal fees paid by pension funds. We therefore find that the evidentiary presumptions set out in 29 U.S.C. § 1401(a)(3) to be arbitrary and violative of Fulton's procedural due process rights.

## VII. UNCONSTITUTIONAL TAKING OF PROPERTY

█ Fulton's penultimate argument is that the withdrawal liability provisions of the MPPAA effect an unconstitutional taking of its property without due process of law. Fulton argues both that its contract rights have been taken and that the MPPAA will confiscate a substantial portion of its assets. Fulton makes this argument even though it has yet to go through arbitration to settle the final amount of its liability.

In *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the Supreme Court identified two factors which have "particular significance" in deciding whether there has been a taking—"the economic impact of the regulation on the claimant" and the nature of the government action: "A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, *see, e.g., United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Id.* at 124, 98 S.Ct. at 2659.

In this case the government has not physically invaded the real property of Fulton. If it had, Fulton could easily prevail. *See Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). Rather, the government simply imposed a new liability on Fulton if it should stop contributing to the pension fund. The government did not totally destroy Fulton's rights to the liquidation value of its business. *Compare Armstrong v. United States,* 364 U.S. 40, 80 S.Ct. 1563, 1564, 4 L.Ed.2d 1554 (1960) (complete destruction of materialmen's lien a compensable taking) (cited in *Penn Central, supra,* 438 U.S. at 128, 98 S.Ct. at 2661) *with Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (diminution of value of land from $800,000 to $60,000 because of ordinance held constitutional without compensation) (*Hadacheck* discussed with approval in *Penn Central, supra,* 438 U.S. at 126, 98 S.Ct. at 2660).

We agree with the district court that until arbitration is completed, it will be impossible to determine whether a fifth amendment taking has been effectuated. Additionally, in regard to Fulton's argument that its contract rights have been taken, we agree with the Seventh Circuit's holding in *Peick* that "[t]he contractual rights of the employe[r] ... are in no way analogous to the type of rights in specific property protected under the takings clause." *Peick, supra,* 724 F.2d at 1276.

## VIII. DEPRIVATION OF PROPERTY WITHOUT A PROMPT HEARING

█ Fulton's final argument is that the MPPAA requires it to begin paying its

withdrawal liability installment payments before the final outcome of the arbitration, and therefore deprives it of its property without a prompt hearing in violation of *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), and *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975). The district court below did not address this issue in its opinion.

The Fourth Circuit in *Republic Industries, Inc. v. Teamsters Joint Council No. 83 of Virginia Pension Fund*, 718 F.2d 628 (4th Cir.1983), found that the MPPAA was ambiguous as to whether installment payments were required to be made pending the outcome of arbitration. *Id.* at 641–42 & nn. 15–16. Applying the basic rule of statutory construction that laws susceptible of more than one meaning should be interpreted so as to be constitutional, we could resolve this question by interpreting the law to require the employer to begin paying the fund only *after* the arbitration. However, since we do not find a significant due process problem even if the statute does require interim payments, we need not give our opinion as to the proper interpretation of the statute at this time.

First, *Fuentes* and *North Georgia* both involved ex parte judicial action by which one party could, without notice, deprive another of the use of property through replevin or garnishment. In contrast, Fulton is challenging a law which may state that it should begin making installment payments on a bill presented to it within sixty days. 29 U.S.C. § 1399(c)(2). On its face, the statute mandates no deprivation of property through judicial action such as a writ of attachment—that would only happen if the pension plan went to court to attach Fulton's assets for nonpayment. If this ever happens, that court will presumably give Fulton whatever procedural safeguards are due it under *Fuentes* and *North Georgia*.

Second, in accordance with the concept that due process is flexible, the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), identified three factors for consideration in a due process analysis of this nature:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. at 903.

In *Mathews*, the Court held that Social Security disability payments could be suspended pending administrative review of eligibility. Applying *Mathews* to the instant case, we find the MPPAA's procedures constitutional. The private interest affected and the risk of erroneous deprivation are small compared with the public interest in enforcement of the withdrawal liability provisions pending arbitration.

## IX. SEVERABILITY

Since we have found 29 U.S.C. § 1401(a)(3) to be unconstitutional, we must consider whether this section is severable from the rest of the MPPAA.

As the Supreme Court has stated, " 'Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.' " *Buckley v. Valeo*, 424 U.S. 1, 108, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976) (quoting *Champlin Refining Co. v. Corporation Commission*, 286 U.S. 210, 234, 52 S.Ct. 559, 565, 76 L.Ed. 1062 (1932)). We must therefore look to "(1) the functional independence of valid and invalid statutory provisions, and (2) the intent of the enacting legislature." Note, *Severability of Legislative Veto Provisions: A Policy Analysis*, 97 Harv.L.Rev. 1182, 1183 (1984).

These presumptions of correctness in the fund's liability calculations are functionally independent of the rest of the statutory scheme. They merely change the

burden of proof in a proceeding to enforce the substantive provisions of the Act. Withdrawal liability may still be assessed, litigated, and collected without these presumptions. In addition, the second prong of the test is met in this case. Although the MPPAA itself did not contain a severance clause when enacted, ERISA does. 29 U.S.C. § 1139. The MPPAA's status as an amendment to a law which already contained a severance provision shows Congress' intent to make its provisions severable. *See* Note, *supra*, 97 Harv.L.Rev. at 1187. Moreover, the paucity of legislative history on this point combined with the importance and complexity of the overall scheme show that Congress would have enacted the MPPAA without these presumptions in favor of the fund's calculation.

## X. RETROSPECTIVE EFFECT

 One final matter deserves our attention. Having found the evidentiary presumptions in the arbitration proceedings unconstitutional, we should consider whether to give this decision prospective effect only—that is, whether it should only apply to arbitration proceedings which have not yet been concluded. *See Great Northern Ry. Co. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932). Three factors must be considered in making this determination:

[F]irst, whether the holding in question "decid[ed] an issue of first impression whose resolution was not clearly foreshadowed" by earlier cases, [*Chevron Oil Co. v. Huson*, 404 U.S. 97, 106, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971)], second, "whether retrospective operation will further or retard [the] operation" of the holding in question, *id.*, at 107, 92 S.Ct. at 355; and third, whether retroactive application "could produce substantial inequitable results" in individual cases, *ibid.*

*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 88, 102 S.Ct. 2858, 2880, 73 L.Ed.2d 598 (1982).

We believe that these criteria have been met here. This is a question of first impression in this circuit; moreover, the other courts of appeals that have directly considered this question found the presumptions to be constitutional. *See Washington Star, supra*, 729 F.2d at 1511; *Textile Workers Pension Fund v. Standard Dye & Finishing Co.*, 725 F.2d 843, 854–55 (2d Cir.1984); *Republic Industries, supra*, 718 F.2d at 640–41. Allowing the reopening of closed arbitration proceedings could severely impair the operation of the Act, which would, in turn, impair our holding that the Act is constitutional in all substantive respects and in all but one procedural respect. Finally, it would impose a substantial hardship on funds and their participants to reopen settled arbitrations and require the funds to rearbitrate under new procedures. This holding does not deprive Fulton of the benefits of its victory because it has yet to go to arbitration.

*Therefore, the decision of the district court is affirmed in part and reversed in part.*